THE STATE v. ROSCOE JACKSON, Appellant.—102 S. W. (2d) 612.

Division Two, March 11, 1937.

*G. W. Rogers* for appellant.

*Roy McKittrick,* Attorney General, and *Frank W. Hayes,* Assistant Attorney General, for respondent.

LEEDY, J.—By information filed in the Circuit Court of Taney County, appellant was charged with murder in the first degree. A change of venue having been awarded, he was tried in the Circuit Court of Stone County and there convicted. The death penalty was imposed by the court upon the failure of the jury to agree as to his punishment. After an unavailing motion for a new trial, he appeals but has filed no brief.

The charge involved in this case grows out of the murder of a motorist, alleged to have been committed at the hands of his "hitch-

hiking'' passenger, who had been picked up along the highway and given a ''lift.'' Looking to the motion for a new trial for assignments of error, we find twelve grounds, one of which we are treating as raising the question of the sufficiency of the evidence. The evidence on the part of the State was to the following effect: That on the morning of August 4, 1934, the dead body of P. L. Bozarth was found on a byroad in Taney County some three hundred feet north of. State Highway No. 78, and at a point about twenty-three miles northeast of the town of Forsyth. Deceased had been shot twice through the head, and probably elsewhere. The body, found at the side of the road, was lying prone, fully clothed (except coat), and had a brown leather glove on each hand. There was a straw hat some six or eight feet from the body. The left hip pocket of the trousers was turned inside out. This gruesome discovery was made by a farmer whose home was about a quarter of a mile distant. He testified that the day before, or two days before, ''just before 11 o'clock, between 10 and 11 o'clock in the morning,'' he 'was working in the woods cutting brush within two hundred yards of the place where the body was found, and at that time he 'heard three or four shots fired from that direction, which sounded like a .22 rifle—two or three in rapid succession, and one ten or fifteen seconds later. The weather had been extremely hot, and the body was already in an advanced state of decomposition. There was evidence to the effect that death had occurred something more than forty-eight hours previously. The coroner was called, and he viewed the body, on which a slip or identification card was found bearing the name of P. L. Bozarth, and giving his address, the kind and number of his motorcar, et cetera. No money was found on the body. Because of the conditions mentioned, the coroner's examination was superficial. However, he did find two bullet holes in the head, but ''didn't look for any more because that was enough for my records.'' There were car tracks indicating a car had been driven off the highway to the place where the body was found, and there it had turned around and returned to the highway.

Deceased was an elderly traveling salesman. Certain portions of Southwest Missouri, including the town of Forsyth, were embraced within his territory, where he had traveled many years and was well known. He traveled by motorcar, and at the time in question was the owner of and using a tan, straight-eight, Dodge coupe, in which he and appellant, who was a hitch-hiker, reached the Shadow Rock tourist camp, at the edge of Forsyth, on the evening of August 1. There was some conflict in the testimony as to whether appellant had been picked up by deceased at Springfield, or at the junction of Highways No. 65 and No. 44. In any event, appellant left Bozarth at the tourist camp and went into town under an arrangement that

they would continue their journey the next morning between eight and nine o'clock. Bozarth stayed all night at the camp, and appellant elsewhere. Appellant returned to the camp early the next morning, and was there some two and a half or three hours until he and Bozarth left in the latter's Dodge coupe. As they were leaving Forsyth, they stopped at a filling station, where Bozarth purchased gas and oil. The owner of the filling station testified Bozarth had a purse containing a sum of money out of which he paid for his purchase, and then put the purse back in his left hip pocket, all of which was seen by appellant who was sitting in the car.

Appellant, who was about thirty-three years of age, was born in a nearby county, where certain of his relatives still resided, and although he had been in Oklahoma for some years, he had acquaintances at Forsyth. Some of these he contacted the night of August 1. They testified he said he was traveling through the country with an oil man from Seminole, Oklahoma; that they were drifting around seeing the country together in a big Dodge coupe; that they were going by his (appellant's) home and see his folks. A number of witnesses testified to certain peculiarities noted in the shoes or oxfords worn by appellant. They were white and black, but the distinguishing mark or identification was the manner in which they had been cut out around the heels. One witness testified he asked appellant why he had the heels so cut, and that appellant replied that because it was hot in the car, and it was done for the purpose of keeping his feet cool.

Appellant was apprehended on or about August 8 at Wewoka, Seminole County, Oklahoma, to which place the sheriff and prosecuting attorney of Taney County, a son-in-law of deceased, and other Missouri officers had gone in anticipation of such an event. The arrest was made by Sheriff Aldrich of Seminole County, and Sheriff Pumphrey of Taney County. At the time of his arrest, appellant was in a black Dodge coupe in company with a young woman. The car was Bozarth's, which had been repainted, and the rear bumper, trunk, spare tires and covers, and ornamental radiator cap had been removed. These accessories, or some of them, were found ''out in the hills'' some six or seven miles from Wewoka, where the repainting of the car had been accomplished. Appellant admitted having done the painting, but said the car ''belonged to another party.'' In it, at the time, was found a .32 caliber Smith & Wesson revolver, the ownership of which appellant admitted, and he had in his pockets shells of that caliber. Oxfords fitting the description of those worn by him while at Forsyth were found in the ''turtle back'' of the car. Appellant was returned to Missouri that night, and en route he told the officers of having been present when Bozarth was held up and

killed, but claimed that another "hitch-hiker," whom they had picked up "had done the job."

Thereafter, at a time not definitely fixed by the record, but apparently shortly after his return to Missouri, and while incarcerated in jail, appellant made a full confession of his guilt to the prosecuting attorney, whose testimony in that connection was as follows: "Q. Tell the jury what he said before making the statement. A. Well, I went up there and was talking to him; and, he started in to telling me about the third fellow. I said, 'Roscoe, if you want to make any statement, all right. If you don't, it is all right. You needn't talk to me about the third party. I know there was not any third party there;' and, he went ahead and said he went out with Mr. Bozarth, and they got out on the road there, not very far from where the body was found, and he put the gun on him and said it was a hold-up; and, Mr. Bozarth said, 'Well, I can't believe it;' and, he said, 'Yes, I mean business.' Had the gun on him, and he said that the old gentleman said, 'What do you want me to do?' 'Well,' he said, 'turn off on the first road you come to;' and, he drove on a little ways, come to this old byroad where the body was found. He pulled out, and he told him to get out; and, Mr. Bozarth got out on the lefthand side of the car; he slipped under the wheel, meaning he got out on the same side, the lefthand side of the car; and, he said 'Turn your back to me;' and, he said Mr. Bozarth turned, but turned around and grabbed at the gun; and, he said, 'I let him have it; shot him three times with a .32 caliber pistol;' and then, he said that he fell on his face. He said he didn't move him from where he was; and, he said he took out a pocket book, out of his left hip pocket. He fell on his face by the left front wheel of the car, and that he didn't touch a thing only took this wallet out of the left hip pocket. Q. Did he say how much money was in that wallet? A. I believe he told me eighteen dollars."

A confession to the same effect was made to Buck Reed, the operator of Shadow Rock tourist camp, and Sheriff Pumphrey, at which other witnesses were present, who also testified. Appellant then minutely detailed the route he had taken from the scene of the homicide to Wewoka, where he arrived the night of August 2. A map of the route, as thus indicated, showed the distance between those points to be something more than four hundred miles. Upon inquiry by Messrs. Reed and Pumphrey, appellant revealed to them where the personal effects of deceased could be found. In fact, he drew a chart of the house and surrounding territory at Seminole. A description thereof was telephoned to the Oklahoma authorities, who testified that they went to the location described, and recovered a box containing an overcoat, traveling bag, two pairs of trousers, a coat and vest, an electric appliance for pressing neckties, and a

brief case, all of which were shown to have been the property of deceased, and offered in evidence. It was shown that while awaiting trial, appellant escaped from the Douglas County jail. Upon being recaptured, in the edge of Howell County, he was armed with a revolver.

Appellant testified at length in his own behalf. The transcript of his testimony covers more than fifty pages of the bill of exceptions. He stoutly denied he had killed Bozarth. In substance, his testimony was that he and another "hitch-hiker," named Young, had been picked up by Bozarth as the latter was leaving Springfield on U. S. Highway No. 65, on the afternoon of August 1, and they had ridden with him to Forsyth; that Young got out of the car before reaching Shadow Rock Camp, but that he, appellant, proceeded on to the camp with Bozarth, arriving there late in the evening; that he saw and visited with several of his acquaintances in Forsyth that evening, and slept on the courthouse lawn; that he returned to the camp early the next morning, joined Bozarth, and after some delay they departed in the Dodge car; that they stopped at a filling station, where Bozarth purchased gas and oil, and after traveling a distance down the highway, they overtook Young, their companion of the day before; that Bozarth stopped his car, and again picked up Young, that Bozarth was in the driver's seat, he, appellant, in the middle, and Young on the right-hand side of the seat of the coupe; that presently Young "elbowed the car door open." His version of what then transpired may be best stated by quoting his testimony, as follows: "Anyhow, he taken his elbow and elbowed the door of the car open, and put one foot on the running board of the car and pulled a pistol. Well, he stuck the pistol—naturally, he was pointing the pistol more at me than the other man at that time, and said, 'Take it easy, boys; this is a hold-up.' And so, Bozarth looked over to him and said; he said, 'You are joking?' and, he said, 'No, I ain't joking; just try some funny tricks;' he said now, yes. He told me to put up my hands, and told Bozarth to keep both of his hands on the steering wheel. Well, I held up my hands. Of course, I couldn't get my hands up high, on account of the top of the car. I am a tall man. I held my hands in that position, and Bozarth left both hands on the steering wheel. He told him not to take his hands off the steering wheel. Bozarth asked him what he wanted him to do. He said 'Slow down.' Bozarth was driving. I imagine thirty-five or forty miles an hour, an ordinary regular speed. He told him to slow down; and, Bozarth slowed down and started like he was going to stop. He said, 'Don't stop the car here; drive up the road a little ways until you get to a place where you can drive off.' We didn't drive over one hundred yards until there was a place to get off the gravel; wasn't shouldered there; might have been a little

shoulder; very little, if any. He ordered Bozarth to turn off; and, he did so; and, I don't know how far he drove after he turned off, because I wasn't giving my attention to the distance; and, he told Bozarth to stop. He said, 'Stop the car and put up your hands;' and, he did so; and, he told Bozarth, said, 'Leave your hand up and take your left hand and open the coupe door, that door; and, if you have got anything in that door pocket, be very careful about it.' Bozarth turned the latch and pushed the door open with his knee; and, he told us to get out; Bozarth getting out first. When Bozarth got out, naturally, he faced the car with his hands up. He raised the other hand about like that (making demonstration) when he got out; and, when I got out, I got out under the steering wheel the same way; and, he slid out under the steering wheel. We all three got out under the same door. Bozarth said, 'Well, what do you want to do?' He said—well, he said, 'Turn around.' He told Bozarth to turn around. He said, 'Turn around;' and, when Bozarth made the attempt to turn around, Bozarth was standing north of me. I was standing, I presume, south. This fellow was standing practically in front of the door of the car; and, I was standing south of Bozarth there; he was standing north of me; and, this fellow was standing between us and the car; and, I had never—when I got out, I never turned my face to the car. I had practically faced what I presume would be west. I don't know really the direction; it was cloudy that morning and pretty gloomy, and wasn't any sun shining. I wouldn't be positive about the direction; but, he told Bozarth— when Bozarth got out, he turned with his face back facing this fellow. He told Bozarth to turn around with his back to him. When Bozarth turned around, he had his hand like this (making a demonstration). He turned on one foot and turned plumb around, slapped at this fellow, made a grab at the gun, missed the gun and grabbed the wrong hand; and, he shot him three times with a 32 automatic. And, he turned the gun on to me and said, 'Well, you God-damn son-of-a-bitch, I ought to kill you. You are the cause of this.'"

He further testified that Young forced him to drive the car at the point of a gun; that they reached Wewoka, Oklahoma, that night by a circuitous route; that he, appellant, painted the car, and removed the trunk and rear bumper so as to "disfigure the car" so that Young could sell it, under an agreement between them; that he and Young separated near Seminole, the latter abandoning the car, and saying he was going to Oklahoma City; that he did not report the affair to the officers, as he explained, "for the simple reason I had no defense or no way of making any explanation why I was in possession of the car." He contended his confession was obtained by threats and duress, on the representation that a mob had gathered, and that he would be protected if he confessed. He denied

knowing the whereabouts of the deceased's effects, but said he did give Buck Reed, as nearly as he could, "the lead of where it might be found." He admitted having been previously convicted for carrying concealed weapons, and serving a term in the penitentiary therefor.

■ I. Complaint is made that it was error to overrule appellant's application for a continuance, filed the day the case was tried, which was during the adjourned October Term of the Stone Circuit Court. The application alleged that the case had been specially set for that term, under an agreement that the regular panel of jurors would be recalled, and that instead of such regular panel, only eighteen of its members were in attendance. No evidence was introduced in support of the motion. The question of whether or not a continuance should be granted is one largely confined to the discretion of the trial court. There is nothing in the record before us to indicate an abuse of discretion on the part of the trial court in ruling the application in question. In the absence of such a showing, the action of the trial court will not be disturbed on appeal. · [State v. Messino, 325 Mo. 743, 30 S. W. (2d) 750; State v. Mosley, 22 S. W. (2d) 784.]

■ II. Grounds two, three and four relate to errors alleged to have been committed by the court in rulings made in connection with the evidence. It is said that the cross-examination of appellant was, in certain respects, outside the range of his direct examination. One of the specific matters so complained of was as to the location of certain places in Oklahoma, and the distance between those places. But appellant had already, on direct examination, detailed the route he took in going to and out of Oklahoma. We do not find a ruling adverse to appellant on the subject complained of, where an objection was timely made. The contention must be overruled.

■ The third assignment likewise goes to the propriety of appellant's cross-examination respecting his separation from Young, whom he claims did the killing. The record shows the matter was opened up on direct examination by the following question: "Tell the jury under what circumstances you and he separated." It was gone into on cross-examination without objection. There is, therefore, nothing preserved in this court for review. [State v. Sherry (Mo.), 64 S. W. (2d) 238; State v. Trainer, 336 Mo. 620, 80 S. W. (2d) 131.] The State is not confined to a categorical review of questions and answers asked on direct examination, but may properly interrogate the appellant on any subject within the range of his direct examination. [State v. Gilmore, 336 Mo. 784, 81 S. W. (2d) 431; State v. Hawley (Mo.), 51 S. W. (2d) 77.]

■ The fourth assignment complains that the court refused to permit appellant to explain his reasons for keeping the automobile in his possession "after having permitted the State to bring out everything as to the possession and changing the automobile." We think the assignment not sustained by the record. The appellant was permitted to state, as shown by the statement of facts, why he kept the car and did not report the affair to the police. Just before leaving the stand the matter was again adverted to, but the court ruled the witness had already fully answered, and excluded it as repetition. In so ruling, the court fell into no error.

■ III. Appellant requested the court to instruct on murder in the second degree, and the failure of the court to do so is assigned as error. The State contends the evidence did not warrant submission of the hypothesis of murder in the second degree, and with this view we are in accord. And, as bearing on that question, it makes no difference whether appellant's version, as related by him on the stand, is adopted as true, and his confessions disregarded, the fact remains that all of the evidence, including the chain of circumstances detailed in the statement of facts, abundantly supports the theory that Bozarth was murdered in the perpetration of a robbery, and this being true, under the statute [Sec. 3982, R. S. 1929, Sec. 3982, Mo. Stat. Ann., p. 2778] it was murder in the first degree. We find no evidence calling for an instruction on second degree murder.

■ IV. The next five assignments relate to the matter of the punishment being fixed by the court instead of the jury and will be treated together. It is contended, first, that it was an error to give the instruction which told the jury that if they found defendant guilty of murder in the first degree but could not agree on his punishment, a verdict in the form of specified by such instruction might be returned.; second, that the giving of such instruction was not timely inasmuch as the jury had been "out only a short time and before they had used sufficient time in deliberation as to the punishment." It appears from the record that after having retired, in the custody of the sheriff, the jury was called back into open court. After inquiry and ascertaining the name of the foreman, the court remarked: "I understand that you gentlemen have agreed upon the guilt of the defendant but that you are unable to agree on the punishment?" The jurors replying in the affirmative, the court then gave the following written instruction: "The court instructs the jury that if you find and believe from the evidence that the defendant, Roscoe Jackson, is guilty of murder in the first degree, and cannot agree on his punishment, you will return into court the following verdict: 'State of Missouri, Plaintiff, versus Roscoe Jackson, Defendant. We,

the jury, find the defendant guilty of murder in the first degree, as charged in the information, but cannot agree on his punishment. ............, Foreman." " A verdict in the form prescribed above was returned. Whereupon the court asked the jurors how they stood on the question of punishment. Being informed that nine members favored the death penalty, appellant's punishment was fixed by the court at the extreme penalty. It does not appear how long the jury had been deliberating when the above proceedings took place, and we are left to speculate as to whether it was an hour or a day.

The motion for new trial further complains of the action of the court in making inquiry as to how the jurors stood on the question of punishment, and "in substituting the mind of the majority of the jury for the mind of the court." Another assignment purports to challenge the constitutionality of Section 3704, Revised Statutes 1929 (Sec. 3704, Mo. Stat. Ann., p. 3259), under which the court acted in fixing the punishment. The assignment, however, is not deemed sufficient to raise the question. That section provides: "Where the jury agree upon a verdict of guilty but fail to agree upon the punishment to be inflicted or do not declare such punishment by their verdict; the court shall assess and declare the punishment and render judgment accordingly. Where the jury finds a verdict of guilty and assess a punishment not authorized by law, and in all cases of judgment by confession, the court shall assess and declare the punishment, and render judgment accordingly." The practice followed in the circumstance shown by this record in applying the statute, supra, is too well established to require a discussion of the authorities sanctioning it. [See State v. Hubbs, 294 Mo. 224, 242 S. W. 675; State v. Levan, 306 Mo. 507, 267 S. W. 935; State v. Bunch, 333 Mo. 20, 62 S. W. (2d) 439; State v. McVey (Mo.), 66 S. W. (2d) 857.

V. This brings us to the last assignment, which is as follows: "Because under the whole record the verdict was the result of passion and prejudice and not the result of unbiased deliberation on the testimony." Under Section 3735, Revised Statutes 1929 (Sec. 3735, Mo. Stat. Ann., p. 3275) such an assignment has been held to be too general, and, therefore, presents nothing for review. [State v. Smith (Mo.), 68 S. W. (2d) 696; State v. Copeland, 335 Mo. 140, 71 S. W. (2d) 746.]

We have examined the record proper, and find no reversible error therein. It follows that the judgment should be, and it is, accordingly affirmed. All concur.

Date for execution set for Friday, April 16, 1937.