STATE of Missouri, Respondent,

v.

Tony ROBINSON, Jr., Appellant.

No. 47353.

Supreme Court of Missouri,

Division No. 1.

Nov. 9, 1959.

Morris A. Shenker, Bernard J. Mellman, St. Louis, for appellant.

John M. Dalton, Atty. Gen., W. Don Kennedy, Asst. Atty. Gen., for repondent.

WESTHUES, Judge.

The defendant, Tony Robinson, Jr., was convicted of manslaughter. The punishment assessed was seven years' imprisonment in the State Penitentiary. An appeal was taken to this court.

The offense was alleged to have been committed in the City of St. Louis, Missouri, at about three o'clock on the morning of July 23, 1958. The victim was Joseph H. Tilley. The trial was held in October, 1958. The verdict returned by the jury stated that the defendant was found guilty of manslaughter but that the jury was unable to agree upon the punishment. The trial court thereupon assessed the penalty.

The defendant filed a brief in this court which contains five separate assignments

of error. The first three pertain to the question of whether the trial court erred in not instructing the jury that the defendant had the right to use such force as was necessary in resisting an attempt by the deceased to commit an act of sodomy on the defendant's person. In the fourth assignment, defendant stated that the trial court erred in instructing the jury that in case the defendant was found guilty and no agreement could be had as to the punishment, then, in that event, the court would fix the punishment. The fifth point briefed reads as follows: "The Court erred in admitting into evidence over the objection of the defendant State's Exhibits Number Two, Three, Seven and Eight, and in permitting the jury to examine said exhibits, for the reason that said exhibits were gruesome photographs of the deceased taken at the scene of the alleged offense and at the City Morgue, that said photographs did not have any probative value in establishing any issue in the case, and operated only to inflame and prejudice the jury against the defendant."

No point is made that the evidence was insufficient to sustain the verdict of guilty. The question before us is whether defendant's contention made in the first three points briefed is supported by the evidence. More to the point, were defendant's rights sufficiently protected by an instruction on self defense which the trial court gave? Or was defendant entitled to an instruction, refused by the trial court, requested to be given on the theory that he, the defendant, had the right to use such force as was reasonably necessary to prevent the deceased from committing an act of sodomy upon the person of defendant?

We shall state the facts necessary for a determination of the questions presented. On the morning of July 23, 1958, at about eight o'clock, the partly nude body of Joseph H. Tilley, a white person, was found lying between two cars in a junkyard or auto-parts lot at 4447 St. Louis Avenue where a number of old automobiles were on the lot and evidently had been there for some time. There were bruises on the head, arms, and chest of Tilley whose body was found lying near an old motor block. A number of empty wine bottles were found, a few of which were in the back seat of a car near the body. In the back seat of one of the cars, a social security card, a paycheck stub, and a laundry ticket were found. All bore the name or identification marks of the defendant, Tony Robinson, Jr., a Negro, living at 4481 St. Louis Avenue.

Tony was arrested and taken to police headquarters where he was questioned. Statements which he made to the police and prosecuting officials were substantially the same as defendant's evidence at the trial. When defendant was arrested, the officers found blood stains on his clothing and also a torn shirt. Tony testified that on the night of July 22, 1958, he had been at the Yukon Bar which was two or three blocks from the junkyard and that he had had "ten or twelve shots of whiskey" and some beer; that when the place closed at about two-thirty o'clock on the following morning, he started for home; that he had in his shirt pocket the social security card and the other papers found by the police. He testified that on his way home, while passing the junkyard lot, Tilley, whom he did not know, accosted him and asked if he wanted a drink to which he replied that he did; that they went to a car, nearby which the body of Tilley was later found, sat in the back seat and drank a fifth of wine. Defendant further testified as to what occurred between him and the deceased, much of which is immaterial to the point now before us. The material facts are, according to defendant's evidence, that deceased insisted on committing sodomy on the defendant; that defendant refused; that an argument which followed culminated in a fight between the two; that deceased grabbed defendant and tore his shirt; that deceased had his trousers down below his knees. What happened thereafter, according to the defendant, may be best stated by quoting his evidence:

"Q. What happened after he grabbed the shirt and tore it? A. Started fighting, exchanged blows; he reached down and picked up a wine bottle.

"Q. Where were you sitting? A. Inside the car.

"Q. Did you exchange blows in there? A. Yes, sir.

"Q. Did you hit him at all? A. Yes, sir.

"Q. Did he hit you? A. Yes, sir.

"Q. What happened after you were scuffling around there? A. He picked up this wine bottle; I grabbed him by the arm and pulled him out.

"Q. You pulled him out where? A. Outside the car.

"Q. Let me ask you this. Which side were you sitting on in the car? A. I was sitting on the right side.

"Q. You were sitting on the right side? A. Right side.

"Q. He was sitting— A. On the left.

"Q. Which door was he pulled out when he had this wine bottle? A. Right door.

"Q. Tell the court and jury after you pulled him out do you know what happened to that wine bottle? A. No, sir.

"Q. Do you know whether or not you knocked it out of his hand, or he dropped it, or if you don't know it, all right? A. I may have knocked it out of his hand. I don't know what happened to it.

"Q. And after that happened, what happened next? A. He was still coming at me and we started fighting again, and I don't know if I hit him and he fell or he slipped, but he fell and his head hit the motor block; he was grab-

bing at my feet; I kicked, trying to kick free—I hit the motor block and turned around and run.

"Q. Do you know where he hit the motor block? A. No, sir.

"Q. You don't know? A. I don't know, no.

"Q. You say, kicking at the motor block—how did you kick the motor block? A. I kicked with my foot, trying to get free, trying to get my feet free of this man, wrestling around my legs.

"Q. Do you know whether or not you kicked the man laying on the ground? A. No, sir.

"Q. All right. You—now, were you arrested when—about ten o'clock? Let me ask you this. What happened after you kicked free? A. I turned around and ran home.

"Q. What did you run home for? A. I was scared.

"Q. What were you scared about? A. The man was like a maniac.

"Q. And let me ask you this. Did you call the police or anything? A. No, sir.

"Q. Why didn't you? A. I didn't know he was hurt."

■ After defendant's arrest, he was examined by a doctor who testified for the State that defendant had no bruises except on the big toe of the right foot. It was found to be fractured and placed in a cast.

The State introduced medical evidence showing the cause of death as discovered by an autopsy. It was listed in the report as subdural hematoma caused by a blow on the head. No skull fracture was found. Bruises were found on the face, arms, legs, and head of the body of the deceased.

The record shows the following to have occurred before the instructions were read to the jury:

"Mr. Shaw: At this time, your honor, the defendant will except to the giving of instructions One, Two, Three and Four for the reason that they do not correctly and fully cover the law in this case. The defendant further requests as part of the instruction on self-defense that the court give an instruction on the right of self-defense when one is threatened with being the victim of a felony. In this case the defendant was threatened with the commission of an act of sodomy by the deceased.

"The Court: All fixed, Bill? I will overrule the objection and deny the request."

It is our opinion that defendant's request should have been granted. The court did give a self-defense instruction in the usual form to the effect that the defendant was justified in acting as he did if "the defendant had reasonable cause to believe and did believe there was a design upon the part of the deceased to do the defendant some great personal injury or great bodily harm, and that there was reasonable cause for the defendant to believe that there was immediate danger of such design being accomplished and that to avert and prevent such apprehended danger, the defendant did strike, * * *."

The State seeks to justify the ruling of the court on the theory that the deceased, to accomplish his alleged desire, would have been compelled to render the defendant unconscious; that, therefore, the self-defense instruction was sufficient; that the only immediate danger to the defendant was personal injury or great bodily harm. This argument overlooks the fact that the principal defense in this case was that the defendant claimed that all he did was to use such force as was necessary to prevent the deceased from accomplishing his purpose and to get away from him; that when he had kicked himself free, he ran home. Whether or not such defense was true or false was a question for the jury under proper instructions. The defendant's theory should have been included in the self-defense instruction.

Sec. 559.040 RSMo 1949, V.A.M.S., reads in part as follows: "Homicide shall be deemed justifiable when committed by any person in either of the following cases:

"(1) In resisting any attempt to murder such person or to commit any felony upon him or her, or in any dwelling house in which such person shall be; * * *."

Sodomy is a felony under our statute. It is a well-established rule of law that a person may use such means or force as is reasonably necessary to prevent the commission of a felony when attempted to be committed by violence or force. In 40 C.J.S. Homicide § 101, pp. 960, 961, this statement is found: "The taking of human life is justifiable when done for the prevention of any atrocious crime attempted to be committed with force.

"*Felonies.* According to the common law, it is the duty of every one, seeing any felony attempted, to prevent it by force, and if need be, by the extinguishment of the felon's existence. A homicide is justifiable when committed by necessity and in good faith in order to prevent a felony attempted by force or surprise, such as murder, robbery, burglary, arson, rape, sodomy, and the like. In applying the rule no distinction is made between statutory and common-law felonies. The rule also is not confined to felonies against the person, but may be applicable to felonies against property." See also 26 Am.Jur. 240, § 124; Pond v. People, 8 Mich. 150, 151, loc. cit. 177; Storey v. State, 71 Ala. 329, loc. cit. 339; Randolph v. Commonwealth, 190 Va. 256, 56 S.E.2d 226, loc. cit. 230, 231; State v. Couch, 52 N.M. 127, 193 P.2d 405, loc. cit. 413(8); State v. Nyland, 47 Wash.2d 240, 287 P.2d 345. The defendant was entitled to an instruction submitting to a jury his theory of justifiable homicide which theory was supported by evidence. State v. Sumpter, Mo., 184 S.W.2d 1005, loc. cit. 1006, 1007(3, 4); Sec. 546.070, subsection (4) RSMo 1949, V.A.M.S. For the error of the trial court in refusing to instruct the jury as to the de-

fense above noted, the judgment must be reversed and the cause remanded.

■ There are other questions briefed which we ought to consider because they might occur on a retrial of the case. The State introduced in evidence, over the objection of the defendant, Exhibits 2, 3, 7, and 8 which were photographs of the body of the deceased. The objection made was that the pictures were "gruesome" and did not have any probative value in proving any issue in the case. It is the opinion of the writer that the designation of the pictures as being gruesome is a gross understatement. They are extremely obscene, offensive, vulgar, horrid, and repulsive. Yet, under the law, the State would be entitled to place them in evidence if necessary to prove a vital fact at issue. We do not find that to be a fact in this case. In making the objection to the exhibits, the defense admitted every fact which may have been proven by the pictures. The only reservation made by the defendant was that he would not stipulate that the injury causing death, that is, subdural hematoma, was caused by the defendant. The pictures are of no value in determining the manner in which that injury was inflicted. Defendant claims deceased in falling struck an old motor block. The position of the body showing the motor block nearby does not add to nor detract from the State's or defendant's theory. It is our opinion that on a retrial these exhibits, if offered, should be excluded. In 23 C.J.S. Criminal Law § 852, pp. 53, 54, we find the following: "When it is material to the issues, a photograph of deceased, or of his body or parts thereof, is admissible in a prosecution for homicide, although the picture has a gruesome or shocking aspect, and tends to excite the passion or prejudice of the jury; but such photographs should be excluded if they are unnecessary and introduced for the purpose of inflaming the jury's emotions. It is within the discretion of the trial court to determine whether or not such a photograph is admissible. Photographs of a person deceased or of a body have been held admissible for purposes of identification, or to show the condition of a victim's body, or to indicate the nature or extent of wounds or injuries."

■ It is true, as stated, that it is within the discretion of the trial court to determine the admissibility of such evidence. However, a ruling of the trial court on such matters may be reviewed on appeal. This question was considered in State v. McDaniel, 336 Mo. 656, 80 S.W.2d 185, loc. cit. 192, 193(4) (5). It was there ruled that such evidence was admissible in cases where "there is a dispute about material facts upon which the exhibit would throw light." In State v. Porter, 276 Mo. 387, 207 S.W. 774, loc. cit. 777(4, 5), this court, after stating rules governing the admission of evidence of this character as being largely within the discretion of the trial courts, stated, "Where, however, as in the case at bar, the corpus delicti is admitted, there is no question as to the identity of the deceased, and the fatal character of the wound has been fully shown, it is difficult to see how the exhibition in evidence of the bloody garments worn by the deceased when killed can be justified as was contended by the state, on the ground that they tended to show the nature and character of the wound. Rollings v. State, 160 Ala. [82], loc. cit. 86, 49 So. 329. On account of the manner, however, of their exhibition, it may well be questioned whether their effect was to improperly influence the jury." See also State v. Pearson, Mo., 270 S.W. 347, loc. cit. 351; State v. Clough, 327 Mo. 700, 38 S.W.2d 36, loc. cit. 39(8, 9); State v. Rennison, 306 Mo. 473, 267 S.W. 850, loc. cit. 853(8).

■ There is no merit in defendant's assignment of error that the trial court instructed the jury to the effect that if there were no agreement on punishment, then the court would assess the penalty. As we read the record, this instruction was given after the jury had had the case under submission for a number of hours and had informed the court of their disagreement. A trial court is justified in so instructing a jury if, after deliberating a reasonable time, the jury in-

forms the court that no agreement can be had as to punishment. S.Ct. Rule 27.03, 42 V.A.M.S.; State v. Jackson, 340 Mo. 748, 102 S.W.2d 612, loc. cit. 617, 618(8).

For the reasons indicated, the judgment is hereby reversed and the cause remanded.

All concur.