**STATE of Missouri, Respondent,**

v.

**John G. PARSONS, Appellant.**

**No. 58147.**

Supreme Court of Missouri, Division No. 2.

Sept. 9, 1974.

John C. Danforth, Atty. Gen., Karen Iverson, Asst. Atty. Gen., Jefferson City, for respondent.

Willard B. Bunch, Public Defender Sixteenth Judicial Circuit, Kansas City, Robert A. Simons, Asst. Public Defender for appellant.

HOUSER, Commissioner.

John G. Parsons was charged in Count I with the first degree murder of his ex-wife Beverly by inflicting upon her a mortal wound with an explosive device, and in Count II with causing an explosive device to be exploded whereby Beverly Parsons was put in danger of death under §§ 564.-560 and 564.570, RSMo 1969, V.A.M.S. Both counts were submitted to a jury, which found defendant guilty of (1) murder in the first degree and assessed his punishment at life imprisonment and (2) bombing. The jury being unable to agree upon punishment for bombing the court assessed defendant's punishment at 99 years' imprisonment and ordered the sentences to run consecutively. Defendant appealed to this Court, which has jurisdiction under its order of April 9, 1973.

The corpus delicti, i. e., the death of a human being by the criminal agency of someone and not by suicide, is not contested and is conclusively established.

Facts sufficient for the jury to find beyond a reasonable doubt that the deceased Beverly Parsons died by the criminal agency of appellant are found in the following circumstantial evidence:

After nearly eight years of married life John G. Parsons and his wife Beverly, residents of Warrensburg, separated in July, 1971, when Beverly left the family home, taking the couple's 6-year-old daughter Jodi with her. Beverly and Jodi visited Beverly's mother in Iowa and then in August took an apartment in Lee's Summit, where Beverly was employed to teach that fall. Sometime in August appellant, in a serious mood, had a conversation with Diane Stanley, who rented the apartment above Parsons' living quarters. Appellant told Mrs. Stanley that he had thought about having his wife murdered; hiring somebody to murder her; that he could hire somebody to do it "cheap" and that "Jodi would be better off if Bev was gone completely." During the late summer and fall of 1971 appellant conversed several times with Richard Meyers. The two had been acquainted for about four years. Meyers had been having difficulty with his own wife. Three or four weeks after the Parsons separated appellant "kind of jokingly" suggested to Meyers that maybe Meyers should "take care of" appellant's wife and appellant should "take care of" Meyers' wife. Meyers answered that it might be a good idea. Appellant and Meyers had a number of conversations with regard to explosives. Appellant asked Meyers what on a car would make a blasting cap go off; asked Meyers to get him some blasting caps; asked Meyers how many sticks of dynamite it would take to blow a car up—to blow up somebody—to kill somebody—in a car. The latter inquiries were made two or three weeks before the bombing. In discussing "how the divorce was coming" appellant told Meyers, "In the end I'll get Jodi." When asked where he was going to live appellant said he may be getting free room and board before too long. After the separation and during the late summer of 1971 appellant and Anthony Gilroy, coemployees of Tom King Construction Company, had approximately a

dozen conversations about appellant's marital situation. In one of those conversations appellant stated that he had indicated to Diane Stanley his intention to kill his wife. Appellant told Gilroy that the child would be better off with one parent missing than for them to be divorced and separated. They discussed explosives and timing devices. Appellant asked Gilroy where he could get a timing device. Gilroy suggested that he could use a watch by rigging terminals on the crystal; that it would pass a small amount of current like that required to "set off a cap." Appellant indicated to Daniel Summit that he was "pretty well shook up" about his separation; that he was going to try to get his little girl, "one way or the other." He wanted his child and he was going to try to have her. Appellant asked Summit if he knew how to wire a car so it would blow up when it was started; whether Summit would "take care of his wife" if appellant "took care" of his. (Summit and his wife had trouble and were divorced in July, 1971.) Between February, 1971 and November 1, 1971 Charles Banning and appellant had five or six conversations about appellant's marital difficulties. In February at a square dance appellant told Banning that he had a bitch of a wife and then changed it to say, "No, I don't have a bitch of a wife, I've got a bitch bitch of a wife." In March at one of the dances appellant made similar remarks, saying that he ought to be glad when she goes to her mother's in Iowa. At the time Beverly went to Iowa appellant told Banning that appellant would be a very jealous ex-husband; that he knew people in Warrensburg that could get rid of somebody; that it wouldn't cost very much; it would be very cheap. This was said just after he remarked that when his wife went to her mother's she probably wouldn't be back; that he was pretty sure she probably wouldn't. Appellant asked Banning if he had any idea about how to hook a bomb up to a car. When Banning said something to appellant about a gun appellant said, "No, not necessarily with a gun. It can be

traced." Banning commented, "Dynamite can be traced when you purchase it," to which appellant responded, "I know a place in Warrensburg that's got a lot of dynamite and they would never know, they would never miss it." This was said in the context of the difficulties between appellant and his wife. On the last day of October or first of November appellant called and told Banning he wanted to see him. They met in a bar and had a conversation concerning Beverly, in which appellant expressed the probability that Beverly had a (boy) friend and was having a good time; that the divorce was coming up; that appellant had made several statements which to his surprise would "come back" to him "just almost the identical way [he] said it from the beginning." Appellant also said, "If you don't see me again, don't work too hard." After the separation and in late September or early October, 1971 appellant told Sharon Copas, with whom he had a date, that if he found out there was someone living with Beverly he would kill her.

Appellant worked for Tom King, a land developer who used explosives, ordinarily 40% gelatin stick dynamite, in his operations. Although he had done no blasting since the summer of 1970 King had a sewer project requiring some blasting, scheduled for the first week in November. Appellant, King's employee, did some blasting for King. Appellant acted as foreman on these jobs. King kept dynamite in a mobile construction shed to which appellant had access. Two weeks before the bombing in question appellant called King's home, spoke to his wife and asked where he could get some blasting caps. He said he had tried to get some at a hardware store but under new regulations hardware stores no longer sold them, and asked if King would get some. King went to a rock quarry, where he purchased six dynamite blasting caps, placed them in his storage building, and told appellant where they were. After the bombing King's storage building was searched and only three of the six blasting caps were found. King

had done no blasting in the interim. Appellant admitted that he was in the storage building on Saturday afternoon, November 6, checking to see if there was sufficient dynamite for the sewer job, and straightening up the sticks of dynamite, which were disarrayed in the box. In so doing he picked up the paper-covered sticks in his hands. This testimony contradicts appellant's first statement to the police, in which he stated that he had never handled any dynamite, and then, after talking to his attorney, stated that he had handled some dynamite 10 days or two weeks previously.

Beverly filed for divorce in the summer of 1971. A divorce was granted to her on November 4, 1971. By its terms she was awarded custody of Jodi. Under the property settlement agreement she had the choice of the furniture in their apartment; appellant was to receive the family car. Appellant and Beverly arranged that Beverly and Jodi would drive from Lee's Summit to Warrensburg on Sunday morning, November 7, when she would make her selection of the furniture she wanted. She would be followed by a truck, into which the furniture would be loaded for the return trip of truck driver and Beverly to Lee's Summit. She was to leave the family automobile with appellant, and he was to have a visit with Jodi. Under this arrangement there was no necessity for appellant to drive to Lee's Summit. Notwithstanding this arrangement, appellant rented a blue Chevelle model Chevrolet in Warrensburg on the afternoon of November 6, for the purpose of driving to Lee's Summit.

At about 10:30 p. m. on November 6, the night before the bombing, Darren Phillips, age 12, who lived two floors below the apartment of Beverly Parsons in Lee's Summit, heard a dog barking, went to the front window, observed a car (identified by Darren's father as a dark, intermediate line Malibu or Chevelle model) stop at the end of the street, and then saw a man open the door and get out of the car. When he opened the door the interior light of the car did not light. The man knelt down, went to the back of the car, ran across the parking lot, crawled over some rocks, lay flat when another car passed. There was something on the man's arm. There were straps, and he carried a big case. He proceeded, cautiously and very rapidly, crawling most of the time, until he reached Beverly Parsons' car. There he knelt down, and the man's feet were observed "sticking out back of the car." The boy quit looking. Then he heard a hood slam down and a "click." Then he saw a man "goose-walk" in front of the living room window. The boy did not see the man well enough to recognize his face. According to Darren's father the man was of slender build, about 6 feet tall. From the time the dog barked until the time the man left the premises there was a time lapse of about 45 minutes. According to Darren's father the man ran diagonally across the parking lot as he left. At 2:06 on the morning of November 7 a police officer observed that the back door of Tom King's workshop, where the dynamite was kept, was standing open.

At 5:30 on the morning of November 7 John Fields, a 16-year-old paperboy, delivering papers at the apartment complex in which Beverly Parsons lived, saw someone "jump back" as he approached the building. Later, while on the middle floor in a lighted area, Fields passed a man in the hallway. Fields asked the man "what he was doing messing around." The man answered that he was just getting ready to go to work. Later at the police station, out of a group of men dressed in civilian clothes, Fields pointed out appellant as the man he had seen that morning. Fields positively identified appellant at the trial.

At 7:30 or 7:35 on the morning of November 7 appellant appeared at the door of Beverly Parsons' apartment. Beverly came to the door. Daughter Jodi was dressed and ready to go. Appellant did not enter the apartment. He was there about five minutes, and he left with Jodi. Without having called in advance, appellant and

Jodi went to the home of appellant's sister and brother-in-law in Lee's Summit, arriving there at 7:40 a. m., driving the rented Chevelle. Appellant, Jodi and appellant's relatives spent the morning visiting.

At 8 o'clock that morning there was a terrific explosion on the parking lot. Beverly Parsons and her automobile were blown to bits. Part of her abdomen and her legs were torn from her torso, and various organs and parts of her body were strewn over a wide area, as far distant as 250 feet from her automobile, which was reduced to a tangled mess of wreckage. A bomb had exploded underneath the driver's seat of the automobile, causing a crater or hole in the parking lot. Photographers called to the scene took numerous pictures of the remains and effects of the blast.

About 11:30 a. m. appellant's sister heard something over the radio about a 29-year-old Lee's Summit schoolteacher being blown up. Appellant and his relatives discussed whether it might be Beverly. Appellant immediately went to the telephone and tried to dial the local police department but he was so upset and nervous that he was unable to make the call. The brother-in-law completed the call. The police told him that the deceased was a twenty-some-odd-year-old woman who had a 6-year-old girl they could not locate. The police told him to come to the station, and he and appellant did so. On inquiry at the station they were told that the deceased was Beverly Parsons. Officers advised appellant of his rights, and asked him if he would submit to a cotton swab analysis of his hands. This is a test whereby isopropyl alcohol and acetone is swabbed onto the backs and palms of a suspect's hands, getting in between the fingers and under the fingernails. The swab is then placed in an individual plastic container which is locked and marked, say "Left hand back," then the palm is swabbed, then the swab used on the back and palm of the other hand is similarly bagged and tagged.

These are sent to the crime laboratory in Washington, D. C. for analysis. At first appellant agreed to take the test. Then he asked to call his lawyer on the telephone. Advised by his lawyer not to consent to the tests, appellant then declined to take them. At that point appellant was placed under arrest, on a charge of "investigation of homicide," and appellant's hands were swabbed and the samples taken without his consent. Appellant's clothes were also taken, without his consent, including his pants, shirt, coat, shoes, socks and underclothing. The clothing was also sent to Washington for laboratory analysis. The analyses of the clothing disclosed no evidence of dynamite. The debris from the bomb crater, subjected to microscopy, vapor trace and chromotographic analyses, contained traces of explosive components—nitroglycerine and ethylene glycol dinitrate—found in dynamite. The same tests, run on the swabbings of the palms of appellant's hands, were positive for nitroglycerine and glycol dinitrate. According to the laboratory expert the positive swab tests on the palms of the hands meant that dynamite was handled; that such traces are discoverable if dynamite has been handled within one or two days before the test is conducted; that one would not get traces such as these "from just picking up an ordinary stick of dynamite"—that it would have to be opened or it would have to have a split in it [1]; that an individual working with dynamite or breaking it open to make a bomb would have this test result on palm swabs, if he did not wear gloves. The expert's opinion was that dynamite was used to set off the blast that caused the crater, and that appellant handled dynamite within a day or two prior to the blast.

At the police station appellant consented to a search of the Chevelle, during which it was discovered that the interior light was inoperative.

Appellant, testifying in his own behalf, denied knowledge of or complicity in the

---

1. Appellant could not recall that there were any half-sticks in the dynamite box on Saturday, November 6.

bombing; denied making the various statements with respect to his former wife attributed to him by state witnesses, and introduced evidence of an alibi, accounting for his presence in Warrensburg at various places during the night of November 6, and particularly about 10:30 p. m., when according to the state appellant was at the parking lot in Lee's Summit. Six witnesses testified to appellant's good character.

In rebuttal the state introduced evidence that Beverly Parsons was afraid of appellant; that he had threatened Beverly with bodily harm; and that in conversation with the officers at the police station, at which time appellant was advised that it was his ex-wife who had been killed, appellant was very quiet, spoke softly, and showed no outward emotion whatsoever.

The foregoing circumstances are consistent with appellant's guilt of homicide and inconsistent with any reasonable theory of his innocence.

■■ From the evidence the jury could have found the following: Appellant was jealous of his wife, and suspected that there was another man in the picture. His animosity toward her persisted throughout the separation. He had murder of his wife on his mind and openly discussed it with several persons. He had used dynamite in the employ of Tom King, and was familiar with its characteristics. He had access to dynamite and he arranged for a supply of dynamite blasting caps. He contemplated murder by bombing and inquired of several associates about the mechanics of setting off a dynamite charge sufficient to kill someone in an automobile. He weighed the advantages and disadvantages of killing by gun or by dynamite. He knew that Beverly would be entering her car the morning of November 7 to drive to Warrensburg. He was at the storage place where the dynamite and caps were kept and had an opportunity and time to construct a bomb on Saturday afternoon, November 6. Although it would have been much simpler for Beverly to bring Jodi with her when Beverly drove to Warrensburg to select the furniture and deliver the car, appellant rented an automobile purportedly for the sole purpose of driving to Lee's Summit to take Jodi for the day. That automobile, or a similar one with an interior light which was not working, was parked at the lot adjacent to Beverly's apartment, at 10:30 on the night before the bombing, at which time there was suspicious activity on the lot at or near Beverly's automobile. The jury could infer that the bomb was then and there attached to the car and wired so as to explode when the car was started. While appellant was not identified as the furtive actor whose suspicious conduct on the parking lot was observed, appellant was observed and positively identified as having been present on the apartment premises at 5:30 on the morning of the bombing. Considering the evidence of appellant's devotion to his daughter Jodi it is difficult to account for appellant's presence at the scene at that early hour except on the basis that he was making certain that Jodi did not enter the automobile with her mother. Tom King's testimony that he talked to appellant that morning in Warrensburg at 6 o'clock is discredited by testimony of an officer that King stated to him in an investigative interview on November 7 that he had seen appellant the previous day, November 6; that in an interview on November 11 King first told him that he did not see appellant November 6, but then changed his statement and related that he did see appellant November 6 at 8:30 a.m. that day, without mentioning that he had talked to appellant by telephone November 7 at 6 a.m. It may be inferred that in visiting his sister and brother-in-law after picking up Jodi on the morning of November 7 appellant was merely playing a waiting game—waiting for the blast to occur and be reported. Appellant's failure to mention Beverly to his relatives on that occasion and his failure to discuss his marital difficulties or divorce (granted only 3 days previously) during the nearly four hours he was with his relatives, and his extreme and incapaci-

tating nervousness when his sister reported the radio news, are acts and omissions which are consistent with guilty knowledge on appellant's part. His impassive, unemotional failure to react to the information received at the police station identifying the victim of the bombing as his ex-wife indicates that the identity of the victim came to appellant as no surprise, and that having regained his composure appellant was attempting to avoid suspicion by assuming an air of nonchalance. The presence of traces of dynamite on appellant's hands less than a day after he admitted handling his employer's dynamite supports the inference that he procured the dynamite and caps from his employer's premises only hours before the blast, and handled it in constructing the bomb. His efforts to account for the presence of traces of dynamite on his hands on the theory that he was preparing to do blasting on the sewer project the following Monday is not convincing. The bona fides of this claim is put in serious doubt by the testimony of the expert that merely handling the paper-covered sticks of dynamite would not transmit particles of dynamite to the palms of the hands, and by the admitted fact that no dynamiting for the sewer job ever materialized—instead of opening up the trench by blasting, the sewer problems were solved by installing manholes which regulated the liquid flow without trenching through rock. Killing by the awesome and terrific force of dynamite, apparently wired to detonate by turning on the ignition of the automobile, compels the inference that the killing was wilful and intentional, premeditated, deliberate, and with malice aforethought.

Next, appellant asserts error in (1) overruling his motion to quash the indictment for multiplicity; (2) in failing to require the state to elect between Count I and Count II of the indictment; (3) in imposing sentence upon each count of the indict-

ment, to run consecutively, "even though the counts stated the same offense."

Count I of the indictment charged that appellant premeditatedly, deliberately and of his malice aforethought made an assault upon Beverly Parsons with a dangerous and deadly weapon, to wit, a device charged with powder or other explosive, thereby inflicting upon her a mortal wound from which she died. Count II charged that appellant wilfully, maliciously and feloniously caused to be exploded a device charged with powder or other explosive whereby Beverly Parsons was put in danger of death.

(1) above is not pertinent because it was not raised below. The record contains no motion to quash the indictment for multiplicity.

(2) and (3) above are pertinent. Appellant at the commencement of the trial moved the court to require the state to elect between the two counts of the indictment because both counts grow out of the same transaction and the same elements apply to both counts, and at the close of the evidence moved in writing for acquittal on the ground that the court erred in not requiring the election, and at the same time orally moved the court to require the state to make the election between Counts I and II "as to what they desire to submit to the jury in this cause, which count." The court effectively overruled these motions by submitting both counts to the jury. As indicated, the jury found appellant guilty on both counts; he was separately sentenced on each count, and the sentences on Count I and Count II were ordered to run consecutively.

The principal crime charged was first degree murder by bombing. The secondary crime charged was bombing in violation of §§ 564.560 and 564.570, RSMo 1969, V.A.M.S.[2] The bombing described in

2. § 564.560: "Whoever shall willfully and maliciously explode or who willfully and maliciously aids, counsels or causes to be exploded any bomb or other device charged with powder or other explosive, whereby any person is or may be put in danger of bodily injury or death, shall be deemed guilty of bombing, and upon conviction thereof shall

each count was the identical, self-same bombing. The person charged in Count I to have been killed by the bombing is the identical, self-same person whose life was charged to have been endangered by bombing, in Count II. The bombing which endangered the victim's life was one and the same, inseparable and indivisible with the bombing which took her life. The victim's death was instantaneous and simultaneous with the explosion of the bomb. The bomb was the death weapon. The necessary act toward the commission of the murder was the bombing. Likewise, the necessary act toward the commission of the bombing was the identical act necessary to constitute the crime of murder. The bombing was an incident included in the crime of murder as charged, but the state has obtained a conviction not only of the crime of murder by bombing but also a conviction for the incident of bombing. Absent a waiver, as in State v. Terry, 325 S.W.2d 1 (Mo.1959), a person cannot be "tried and convicted for a crime which has various incidents included in it," and at the same time be tried for one of those incidents, "without being twice put in jeopardy for the same offence." In re Nielsen, 131 U.S. 176, 188, 9 S.Ct. 672, 676, 33 L.Ed. 118 (1889). There was but one crime. The state cannot split a single crime and prosecute it in separate parts. State v. Toombs, 326 Mo. 981, 34 S.W.2d 61, 64 (1930); State v. Whitley, 382 S.W.2d 665 (Mo.1964); State v. Richardson, 460 S.W.2d 537, 539 [1] (Mo. banc 1970). If there is but a single act of force proved as an incidental means of committing a murder that act of force may not also be charged as a separate crime. In that situation only one punishment may be had. These principles and the authorities in support are annunciated and cited in the en banc decision of State v. Richardson, supra, which is controlling in this situation. In North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), the

United States Supreme Court, citing Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), stated:

"* * * [T]he Fifth Amendment guarantee against double jeopardy is enforceable against the States through the Fourteenth Amendment. That guarantee has been said to consist of three separate constitutional protections. It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. *And it protects against multiple punishments for the same offense.*" (Our emphasis.)

■ This conclusion is not negatived by Rule 24.04 V.A.M.R. as amended effective July 1, 1971, authorizing joinder in the same indictment or information of all offenses based on the same act. That rule allows such joinder only when the joinder is proper, i. e., when there are two or more separate, separable and distinct offenses based on the same act. It has no relevance to the situation here present, where in law and in fact there is only one crime. State v. Neal, 514 S.W.2d 544 (Mo.1974). Accordingly, because there was but one crime, the case was improperly submitted to the jury on Count II, and the judgment convicting appellant of the separate charge of bombing, and sentencing him to 99 years' imprisonment for that crime, must be reversed.

■ Appellant claims that the court abused its discretion in admitting in evidence State's Exhibits 1–38, 40, 41 and 43. All of these exhibits except No. 43 were explicit photographs of the crime scene, the wreckage of the automobile, and the remains of Beverly Parsons.

The first 19 exhibits, which depicted the upper torso and head of the victim and the remains of the automobile from several an-

---

suffer death or be imprisoned in the state penitentiary for a term of not less than two years."

§ 564.570: "The willful and malicious explosion of any bomb or other device charged with powder or other explosive is hereby declared to be and defined as 'bombing.'"

gles, various body parts of the victim, the apartment, debris, and two aerial views of the scene of the crime, were not objected to on the grounds now asserted, but for lack of proper identification and that the exhibits spoke for themselves. The rulings on those objections have not been properly preserved for appellate review, so we confine our discussion to the remaining exhibits.

When the rest of the photographs were about to be identified and introduced appellant's counsel made a general objection on the grounds that they were cumulative, did not tend to prove any additional fact not already proved, and would be highly inflammatory and create passion and prejudice. Exhibits 20–38 showed the left side of the car, body parts of the victim, and blasting caps. Exhibits 40 and 41 were charts showing disposition of body parts at the area of the blast. Exhibit 43 was a reel of moving pictures taken at the scene. Citing authority for the proposition that photographs should be excluded if unnecessary and are introduced for the purpose of inflaming the jury, and that demonstrative evidence of this character is admissible only "if it tends to connect the accused with the crime, or to prove the identity of the deceased, or show the nature of the wound, or throw any relevant light upon a material matter at issue," State v. Moore, 303 S.W.2d 60, 65 (Mo. banc 1957), appellant claims that the evidence should not have been admitted, under the rule laid down in State v. Robinson, 328 S.W.2d 667, 671 (Mo.1959). Appellant argues that the fact of the explosion, the death and identity of Beverly Parsons, and the bombing as the cause of her death, were not contested issues; that there "was no weight of contradicting evidence to overcome by a plethora of gruesome and revolting photographs"; that the necessary proof could have been accomplished "in a far less inflammatory fashion with a fraction of the exhibits used," and that the court abused its discretion by permitting a "wholesale appeal to the revulsion and emotional reaction of the jury to this heinous event."

The court did not err. No abuse of discretion is shown. At the time these exhibits were admitted in evidence appellant had made no admissions or concessions which would have served to relieve the state of any part of the burden of proving any element of the crime, as was the case in State v. Robinson, supra, 328 S.W.2d l.c. 671 [3]. There had been no concession that the destruction and devastation had been wrought by a bomb; that a death had resulted, or that the person killed was Beverly Parsons. At that time the state shouldered the burden of proving these elements and of establishing the extent of the force and violence employed, and that the bomb was planted in the automobile premeditatedly, deliberately, and with malice aforethought, for the purpose of killing Beverly Parsons. It was not until page 151 of the transcript, after all of the exhibits in question had been admitted in evidence and shown to the jury, that counsel for appellant for the first time conceded that there would be no claim that the deceased person was anyone other than Beverly Parsons. Therefore, contrary to appellant's contention, the fact of the explosion, the death and identity of Beverly Parsons, and the bombing as the cause of her death, *were* contested issues at the time these exhibits were admitted in evidence, and the burden then rested upon the state to prove these issues beyond a reasonable doubt. These exhibits bore directly upon these material matters at issue. Whether the quantum of proof went beyond the necessities of the situation was a matter resting within the sound discretion of the court. Under State v. Stevens, 467 S.W.2d 10, 50 A.L.R.3d 96, (Mo.1971), cert. den. 404 U.S. 994, 92 S.Ct. 531, 30 L.Ed.2d 546; State v. Edwards, 435 S.W.2d 1 (Mo.1968); State v. Thresher, 350 S.W.2d 1 (Mo.1961); State v. Moore, supra, and State v. McDaniel, 336 Mo. 656, 80 S.W.2d 185 (1935), and the rules therein stated, which need no repetition here, there was no abuse of discretion in admitting the

exhibits in question. There was ample evidence from which the jury could conclude that appellant commited this murder and if guilty of the evil act he is in poor case to ask to be shielded from the exhibition of the stark facts. As the trial court observed in a colloquy out of the hearing of the jury, "Certainly they [photographs of the torso] are ugly, but the act, whoever did it, is ugly." "If photographic views are shocking, when presenting an accurate picture, it is because the crime is one of that sort, whether described in words or pictures." State v. Stevens, supra, 467 S. W.2d l.c. 24. The photographs, while gruesome, were admissible upon material matters at issue, particularly the element of deliberation. State v. Clark, 494 S.W. 2d 26, 30 [5] (Mo. banc 1973).

Appellant claims reversible error in overruling his motion to suppress evidence of the results of the swab tests performed upon his hands to determine whether he had handled dynamite, and by allowing that evidence to be presented to the jury, for the reason that the tests were performed against appellant's will and not pursuant to any lawful authority; that taking physical evidence from appellant's person constituted a search and seizure under the Fourth Amendment; that the search and seizure was made without warrant, and upon the basis of an unlawful arrest; that the officers had no probable cause to arrest appellant—no facts within their knowledge at the time of the arrest tending to connect appellant with the death of the victim; that a search on mere suspicion is not permissible.

 There was probable cause to arrest appellant for investigation of homicide, based upon the fact that at the time of arrest the officers knew (1) that Beverly Parsons, shortly before 8 a. m. on the day in question, was killed by the criminal act of someone when dynamite or some kind of explosive had blown her and her car to pieces; (2) that the victim was a young schoolteacher; a private citizen who was not a likely target for murder by an organized crime syndicate or other criminal elements who might employ a bomb as the murder weapon; (3) that she had been previously married to appellant; (4) that her ex-husband had arrived at her apartment about 7:45 that morning, when he picked up their 6-year-old daughter Jodi; (5) that appellant and Jodi could not be located for hours after the explosion; (6) that appellant called the police department after noon that day and at the request of police voluntarily came to the police station about 1 p. m.; (7) that appellant stated he had heard on the radio that a young schoolteacher had been killed in Lee's Summit, and he wanted to know if it was his ex-wife; (8) that when apprised of the identity of the victim appellant was quiet, spoke softly and showed no outward emotion whatsoever; (9) that after appellant was advised of his Miranda rights he first stated in answer to official inquiry that he had not handled dynamite recently; (10) that at first he agreed to submit to a swab analysis of his hands, but when he learned that the test would reveal whether he had handled dynamite recently, he withdrew his consent to take the test, and changed his story, then stating that he had handled dynamite 10 days or 2 weeks previously; (11) that after talking to his lawyer by telephone he returned reaffirming his refusal to permit the swab analysis of his hands and declining to make further statements.

 From this knowledge the arresting officer could reasonably have concluded that this bombing was the act of someone who had a personal motive for the killing; that appellant had had marital trouble with the victim; that appellant may have had prior knowledge that the bomb had been set and an expectation that the explosion would occur when the car was started, because of his appearance on the scene fifteen minutes before the bomb exploded, to take his child out of the danger of harm by entering the car with her mother; that when appellant received the news that the

victim was his ex-wife he was impassionate and unemotional; that appellant was concealing matters of importance because of his failure to tell the truth about recent handling of dynamite when first questioned, and then confessing that he had handled dynamite upon being informed that the swab analysis test would reveal the facts; that he had something to hide because he first consented to the test but after learning its potential refused to submit to the test, and after conferring with counsel reaffirmed his refusal. In the foregoing we find sufficient grounds for the officers to pursue the investigation of appellant for homicide and to arrest him for that purpose, especially considering the evanescent character of the clues sought by the officers. The experts working with the arresting officer knew that microscopic particles of dynamite on a person's hands will vanish in a day or two; knew that it was highly important to make the test immediately, to prevent handwashing or other means of destroying any incriminating evidence on appellant's hands. Under Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034 23 L.Ed.2d 685 (1969), and Cupp v. Murphy, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed. 2d 900 (1973), the search involved in making the swab analysis of the palms of appellant's hands was constitutionally permissible. In Cupp v. Murphy a message was sent to Cupp, who was not living with his wife, that she had been murdered. She died by strangulation. Cupp voluntarily went to the police station for questioning. Police noticed a dark spot on Cupp's finger. Suspecting that it was dried blood they asked to take a sample of scrapings from his fingernails. Cupp refused. Over Cupp's protest, without first having arrested him, and without a warrant, the police took samples from under his fingernails. The samples contained incriminating evidence used against Cupp at his murder trial. Convicted, he appealed, claiming the scrapings were the product of an unconstitutional search. At the time the scrapings were taken the officers knew that the bedroom where the victim was strangled showed no signs of disturbance, indicating that the killer was known to the victim rather than a burglar or stranger; that the only other person in the house did not have fingernails which could have made the lacerations on the throat of deceased; that defendant and his wife had had a stormy marriage and did not get along well; that defendant had been at the home that night; that he claimed he did not enter the house or see his wife; that he volunteered a great deal of information without being asked, yet expressed no concern or curiosity about his wife's fate. Holding that the police had probable cause to make an arrest, and considering "the very limited intrusion undertaken incident to the station house detention, and the ready destructibility of the evidence," the Supreme Court of the United States could not say that the search violated the Fourth Amendment, and upheld the conviction. By parity of reasoning we hold that the conduct of the swab analysis was not an unreasonable search or seizure and the testimony as to the results of the analysis was properly admitted in evidence.

Judgment of conviction of bombing under Count II reversed, and sentence of 99 years' imprisonment on that charge set aside; judgment of conviction of murder in the first degree under Count I, and sentence of life imprisonment on that charge, affirmed.

STOCKARD, C., concurs.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the Court.

All of the Judges concur.