STATE of Missouri, Respondent,

v.

David LEISURE, Appellant.

No. 69470.

Supreme Court of Missouri, En Banc.

April 19, 1988.

Rehearing Denied May 17, 1988.

---

Henry B. Robertson, Asst. Public Defender, St. Louis, for appellant.

William L. Webster, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

ROBERTSON, Judge.

A jury convicted David Leisure of capital murder in the bombing death of James Michaels, Sr., and fixed his punishment at death. On direct appeal to this Court, Mo. Const. art. V., § 3, appellant assigns numerous points of error which deal primarily with the jury selection process, the venue of the trial, the state's cross-examination of appellant's psychological witnesses, reference to other crimes by the state's informants, and evidence and instructions in the penalty phase. The judgment of the trial court as to appellant's guilt and the sentence of death is affirmed.

I.

According to the record, the murder in question was the product of simultaneous power struggles within an organized crime entity described as being composed of persons of Syrian and Lebanese descent within St. Louis and Local 110 of the Laborers Union, which was headed by the victim, James A. Michaels, Sr.; Michaels was the reputed head of "the Syrians." The record further reveals that a second, competing organized crime unit existed in St. Louis known as "the Italians," headed by Anthony Giordano.

In early 1977, Ray Massud promised Anthony Leisure, appellant's cousin, that he would succeed Massud as Local 110's business manager. While in the hospital with a terminal illness, Massud changed his mind, asking Anthony Leisure to accept the job of assistant business manager and to allow John Massud, his son, to serve as business manager of the union. Anthony Leisure agreed. On June 30, 1977, after Ray Massud's death, the appointments were made to the Union positions in accordance with the agreement. Under the "terms" of the agreement, Leisure would control the hiring and firing of union officers; John Massud would operate the union office.

John Massud began to hire Union officers without consulting Anthony Leisure. Moreover, Massud hired Vince Giordano, nephew of Anthony Giordano, as a union organizer. Mike Trupiano, another nephew of Anthony Giordano, became Union president in May of 1979, with Massud's blessing and, again, without Anthony Leisure's consent.

Angered by Massud's breach of their agreement and his resulting loss of power within the union, Anthony Leisure met with his brother Paul, Ronald Broderick, John Ramo, Charles Loewe and appellant to consider whether John Massud should be murdered for violating the agreement. The group reached no decision. The Leisures' feared Massud's political ties in St. Louis City politics.

Later, Massud complaining that the union payroll was too high, announced that he planned to fire Broderick. Broderick was the only union officer Anthony Leisure had appointed. The Leisures, including appellant, Broderick, Ramo and a Fred Prator, convened another meeting. Again, the subject was the preservation of Anthony's power within the union. The group again thought it unwise to kill Massud for the reasons earlier stated; nor did they wish to start a war with the Italians by killing Trupiano. They selected James Michaels, Sr., as their victim. Michaels' death would enhance the Leisures' position among the Syrians. It would also send a strong message to the union leadership. The Leisures also believed that Michaels had protected

the murderer of appellant's older brother, Richard.

After an unsuccessful attempt to shotgun Michaels at a St. Louis restaurant, appellant and his coconspirators decided to bomb Michaels' car. On September 4, 1980, appellant and Ramo stole a car that matched the make and model of Michaels' car, and practiced planting a bomb. Appellant followed Michaels around the city to learn of his habitual movements.

On September 17, 1980, appellant spotted Michaels' car in the parking lot of St. Raymond's Catholic Church. The participants in the plan to kill Michaels moved into action. Anthony Leisure, Broderick and Ramo picked up a van belonging to Broderick's son. They drove the van to another location, where they retreived the bomb and joined appellant. Prepared now to kill, they drove to St. Raymond's Church, parking the van next to the victim's car. Appellant slid under Michaels' car and attached the bomb; the quartet drove the van to a strategic place where they could see Michaels return to his car. The victim came out of the church with his grandson, James Michaels, III, a Local 110 union organizer. The senior Michaels entered the car and began talking with his grandson through an open window. Appellant suggested that the bomb be detonated at that instant in order to kill both Michaels. Anthony Leisure convinced appellant otherwise.

The van followed as the elder Michaels drove away from the church. Anthony tried to detonate the bomb several times without success; the radio controlled detonating device refused to work. For a moment, the murderers lost Michaels but saw his car on I–55. Giving chase, they caught their victim. Anthony again threw the switch on the detonating device; the bomb did not go off. Frustrated, Anthony threw the switch again and again until finally the bomb exploded. The victim's upper torso was ripped from the rest of his body and thrown from the car. It struck the windshield of the vehicle following.

The van immediately left the highway and headed toward Illinois. Breaking up the remote control detonating devices, the murderers threw pieces out as the van sped along. In Illinois, they washed the van several times. Returning to Missouri, they stopped at an automobile supply store where appellant bought new windshield wiper blades in an attempt to remove all traces of the explosion from the van. A stop at a drug store brought rubbing alcohol and shaving lotions, which were used to remove the odor of explosives from the hands of the killers.

Approximately a week after the murder, Paul Leisure met with John Vitale, the new leader of the Italians. (Anthony Giordano had died.) Leisure and Vitale agreed that the Syrians would control the Local 110. Two relatives of Michaels lost their union jobs immediately after the murder.

The jury found appellant guilty of first-degree murder. At the punishment phase of the trial, the jury found the following statutory aggravating circumstances: (1) that appellant knowingly created a great risk of death to more than one person by means of a device which would normally be hazardous to the lives of more than one person, Section 565.032.2(3), RSMo 1986; (2) that appellant was an agent or employee of Paul Leisure and at his direction murdered the victim, Section 565.032.2(6), RSMo 1986; (3) the murder of the victim involved depravity of mind and was therefore outrageously and wantonly vile, horrible, and inhuman. Section 565.032.2(7), RSMo 1986. The jury also found appellant's Rackateer Influenced and Corrupt Organizations Act (RICO) conviction as a nonstatutory aggravating circumstance. The jury fixed appellant's punishment at death.

On appeal, appellant does not challenge the sufficiency of the evidence supporting the conviction.

## II.

Appellant first raises several points of error focusing on the jury selection process.

### A.

Appellant initially contends that the trial court erred in denying his challenge for

cause of venireman Zewiski. Appellant claims Zewiski had formed an opinion from rumor and publicly regarding appellant's guilt.

We begin with the familiar adage that "in determining the qualifications of a prospective juror, the trial court has very wide discretion, and the court's ruling will not be disturbed on appeal unless it is clearly against the evidence and constitutes a clear abuse of discretion." *State v. Treadway*, 558 S.W.2d 646, 649 (Mo. banc 1977), *cert. denied*, 439 U.S. 838, 99 S.Ct. 124, 58 L.Ed. 2d 135 (1978).

The relevant portion of *voir dire* follows:

MR. ROGERS [The prosecutor]: You have formed an opinion; is that correct?

VENIREMAN ZEWISKI: Yes.

MR. ROGERS: And that opinion you formed, can you set that opinion aside if you were a juror in this case and base your decision solely on the testimony?

VENIREMAN ZEWISKI: No, I don't think I'd make a good juror on this particular case.

MR. ROGERS: Well, is there something about this particular case that prevents you from being a good juror, something particular?

VENIREMAN ZEWISKI: Yes.

MR. ROGERS: Would you rather get specific about that up at the bench, or do you think you can keep it pretty general?

VENIREMAN ZEWISKI: Well, I—

MR. ROGERS: Do you know any of the parties involved?

VENIREMAN ZEWISKI: No.

MR. ROGERS: Okay. Is there something about the situation that existed that led to this event that caused you any kind of fear?

VENIREMAN ZEWISKI: No. I just formed an opinion, and that—

MR. ROGERS: Well, now wait. You formed an opinion. Obviously you formed that opinion before you came here today; is that correct?

VENIREMAN ZEWISKI: Oh, I didn't know about this today. So—

MR. ROGERS: Now, that opinion you formed was based on probably a lot of things. Radio, television, and maybe even discussing things with friends of yours?

VENIREMAN ZEWISKI: Yes.

MR. ROGERS: Okay. And do any of your friends have any access to information about the case other than the radio and TV?

VENIREMAN ZEWISKI: Well, some.

MR. ROGERS: Some. Okay. Do you have any friends that are related or participated in judicial enforcement, law enforcement?

VENIREMAN ZEWISKI: No.

MR. ROGERS: Do you have any friends that know people on either side of this matter?

VENIREMAN ZEWISKI: Yes.

MR. ROGERS: Okay. Now, those individuals, I take it that you respect them and the fact that they're friends of yours.

VENIREMAN ZEWISKI: Yes.

MR. ROGERS: And you would expect that friends of yours would talk to you and tell you what they believe to be the truth; is that correct?

VENIREMAN ZEWISKI: Yes.

MR. ROGERS: Now, with that in mind, though, do you understand that in the courtroom, you've got testimony, and it's different than sitting around at somebody's dinner table and talking about what I heard so and so said. And what somebody down at the union hall told me was happening. Here you have people that have to stand scrutiny by both sides. People have to answer questions in a very technical environment. We have rules we ask questions by, and we have attorneys that can put those people up to what they call a crucible, put them in there and really examine them. And when you watch this whole thing occur, you have to make some kind of decision based on what you hear.

And it may come out that you find out that your friend who told you that he heard so and so happened was just full of hot air. I mean, you had this information from the wrong source. You know, it happens.

VENIREMAN ZEWISKI: Yes.

MR. ROGERS: With that in mind, that's what I'm saying. Could you listen to testimony and listen to it in an unbiased manner?

VENIREMAN ZEWISKI: Well—

MR. ROGERS: And if you found out it contradicted with what your next-door neighbor said, say, "Well, sorry, Betsey, you're out of luck. I heard what happened under oath, and this is the way I rule." That's what I'm asking you about.

VENIREMAN ZEWISKI: Right. Yes.

MR. ROGERS: Nobody likes to be on jury duty and particularly people don't like to be on capital murder cases. Okay. There's nothing nice or fun about it. But all I want to know is if you feel you can do your duty if you have to.

VENIREMAN ZEWISKI: If I have to.

\* \* \* \* \* \*

MR. ZVIBLEMAN [Defense Counsel]: You said you can't set your opinion aside or you can?

VENIREMAN ZEWISKI: I don't think so.

MR. ZVIBLEMAN: Okay. Okay. Now, I understand that you went through a long discourse with Mr. Rogers on this, and I don't want to repeat all of it. I just need to know from your gut and from your heart whether you can—

VENIREMAN ZEWISKI: I don't know if I could completely get it out of my mind.

MR. ZVIBLEMAN: Okay. Do you think that may still influence you in some way?

VENIREMAN ZEWISKI: Yeah, I do.

MR. ZVIBLEMAN: Okay. Thank you.

Section 546.150, RSMo 1986, provides:

It shall be a good cause of challenge to a juror that he has formed or delivered an opinion on the issue, or any material fact to be tried, but if it appears that such opinion is founded only on rumor and newspaper reports, and not such as to prejudice or bias the mind of the juror, he may be sworn.

In determining the existence of bias or prejudice, the test is whether an opinion held by a venireman will "readily yield to the evidence in the case, and that the juror will determine the issues upon the evidence adduced in court, free from bias." *State v. Wilson*, 436 S.W.2d 633, 638 (Mo.1969). Whether bias or prejudice exists is a finding of fact, the determination of which "is essentially one of credibility, and therefore largely one of demeanor." *Patton v. Yount*, 467 U.S. 1025, 1038, 104 S.Ct. 2885, 2892, 81 L.Ed.2d 847 (1984).

We repeatedly encounter circumstances in which a venireman, unschooled in the law, and burdened with some reluctance to serve on a jury at a trial in which the death penalty is sought, speaks truthfully and freely on *voir dire* about the awesome duty he or she is asked to undertake. This is how it should be. *Voir dire* is designed to provide a window into the opinions, biases, and reservations a person holds about jury service.

■ That a juror holds opinions about a case or about the penalty involved, however, is not automatic grounds for disqualification. The determinative question is not whether a venireman has an opinion. It is instead whether that opinion is of such intensity and holds such sway over the mind of a venireman that it will not yield to the evidence presented at trial. The *voir dire* process is designed to draw a critical distinction between veniremen holding opinions which will yield to the fact presentation at trial and those persons whose opinions will not so yield.

■ Venireman Zewiski said she would do her duty "if I have to." The trial judge determined not to strike her for cause. "[W]e cannot fault the trial judge for crediting her earliest testimony, in which she said that she could put her opinion aside '[i]f she had to,' rather than the later testimony in which defense counsel persuaded her that logically she would need evidence to discard any opinion she might have." [Emphasis added.] *Patton v. Yount*, 467

U.S. at 1039–40, 104 S.Ct. at 2893. The point is denied.

### B.

Appellant objected to the prosecutor's "death qualifying" techniques on *voir dire* and now assigns error to the trial court's failure to sustain his objections. Appellant argues that the state sought to commit the jurors to returning the death penalty by specifically referring to the facts of the case and asking these potential jurors to speculate as to their verdict in the event that the state proved those facts and showed sufficient aggravating circumstances. Appellant relies on *Witherspoon v. Illinois*, 391 U.S. 510, 521, 88 S.Ct. 1770, 1776, 20 L.Ed.2d 776 (1968). *Witherspoon* prohibits a method of death qualification of veniremen on *voir dire* which yields "a tribunal organized to return a verdict of death."

*Witherspoon* makes clear "that while a prospective juror cannot be expected to say in advance of trial whether he would vote for the death penalty in the case before him, he must 'be willing to *consider* all of the penalties provided by state law, and ... not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings.'" (Emphasis in original.) 391 U.S. at 522, n. 21, 88 S.Ct. at 1777, n. 21, quoted in *State v. Antwine*, 743 S.W.2d 51, 60 (Mo. banc 1987). *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), reduced the *Witherspoon* test to a determination of whether a potential juror's views about capital punishment "would prevent or substantially impair the performance of his duties ... in accordance with his instructions and his oath." 448 U.S. at 45, 100 S.Ct. at 2526.

The purpose of *voir dire* is to discover the state of mind of prospective jurors and determine by examination which harbor bias or prejudice against either party which would render them unfit to serve as jurors. "In a capital murder case, inquiry into the venire members' views about the death penalty is of critical importance to the state, the defendant and the court. It is the duty of all concerned to investigate those views thoroughly in order to assemble the most qualified jury." *Antwine*, 743 S.W.2d at 60.

Discovery of the nature and extent of an individual's bias requires not only deep probing as to opinions held but also the revelation of some portion of the facts of the case. As we have said, "an insufficient description of the facts jeopardizes appellant's right to an impartial jury." *Antwine*, 743 S.W.2d at 58. On the other hand, counsel is not permitted to try the case on *voir dire* by a presentation of facts in explicit detail. *State v. Wilkerson*, 616 S.W.2d 829, 834 (Mo. banc 1981). Thus, "a balance must be struck implicating both due process concerns and the requirements of the individual case." *Antwine*, 743 S.W. 2d at 58.

We rely on our trial courts to judge whether a disclosure of facts on *voir dire* sufficiently assures the defendant of an impartial trial without at the same time amounting to a prejudicial presentation of evidence. Absent abuse, the trial judge's discretion in this regard will be upheld.

In this case, appellant urges that the prosecutor's use of the words "will you be able to", "can you", "could you", and in one instance, "will you", on *voir dire* were words of commitment seeking to assure that the death penalty would be imposed if the state proved certain facts and aggravating circumstances. Appellant argues that these words mandate reversal.

■ We disagree. Ours is not a jurisprudence of incantation. Words uttered on *voir dire* are not measured alone as though possessing some mystical quality. Instead, words must be judged in the context and circumstances in which they are heard. Only in this way can we determine their prejudicial effect, if any.

Here, the prosecutor informed the venire that its members must "consider the entire range of punishment". He continued, "you have to legitimately consider the punishment and, quite frankly, there are many people, because of their moral beliefs or

religious beliefs that absolutely can't consider imposing the death penalty under any circumstances. There is nothing wrong with that, we have to know that first." Again, he said, the prosecutor stated "I'm not asking you to commit yourself to voting for the death penalty at this point. That's not the way the system works. What I have to know, though, is if you really will consider it. You don't have to impose it."

Subsequent questions to veniremen about the imposition of the death penalty asking, "will you be able to", "can you", and "could you" sought to determine whether they would be willing to consider the full range of penalties authorized by state law, including death. *Witherspoon* approves such questioning. 391 U.S. at 522, n. 21, 88 S.Ct. at 1777, n. 21.

In a single instance, the prosecutor asked, "Will you go ahead and fix the appropriate punishment of death?" Far from obtaining a commitment, the venireman responded, "I don't know how to answer that right now." In this context and under all the circumstances of this case, we do not believe the trial court's failure to sustain objections regarding the death qualification *voir dire* was error.

■ As to the State's recitation of facts during the *voir dire,* we again find no error. We repeat, the jury is required to know something about the case in order to allow the court and all parties to ferret out bias. The trial court is vested with broad discretion in determining the point at which the fact presentation impinges on the defendant's right to a fair trial. *Antwine,* 743 S.W.2d at 60. Our review of the record reveals no abuse of discretion. The point is denied.

## C.

Appellant next contends the trial court erred in striking eight veniremen for cause on the state's motion. In *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed. 2d 841 (1985), the United States Supreme Court observed:

In addition to dispensing with *Witherspoon's* reference to "automatic" deci-

sionmaking, this standard likewise does not require that a juror's bias be proved with "unmistakable clarity." This is because determination of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear".... Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.

469 U.S. at 424–26, 105 S.Ct. at 852–53.

Even from the sterility of the printed page, the record shows that the veniremen about whom appellant complains expressed substantial reservations about their ability to consider the death penalty in the context of this case. Appellant's trial counsel preserved error in his motion for new trial with regard to but one of these veniremen, Stanley Latko. Our review of the trial court's strikes of all but Mr. Latko is under the plain error standard. Rule 30.20.

Appellate courts necessarily afford the trial judge broad discretion in matters of challenges for cause. The trial court maintains a far superior position to interpret and evaluate the totality of a venireman's answers and demeanor than does an appellate court. We find no plain error nor manifest injustice in the trial court's strikes of the seven veniremen where error was not preserved.

As to Latko, after a general statement to the venire that this case involved state's witnesses who had entered plea bargain agreements, the prosecutor inquired. "Do you feel you can't consider the death penalty for this man because we let somebody else get less than that?" Latko responded, "I think they should have got the same thing." Later Latko said, "If he is guilty, he is guilty, but I wouldn't go for a death penalty if the other guys got off."

There is simply no error in the trial judge's determination that Latko be struck for cause. He clearly and unequivocally refused to consider the death penalty under the circumstances of this case. Appellant's point is denied.

### D.

Appellant next argues that the trial court erred in overruling appellant's challenge for cause of venireman Audrey Chenoweth because "her opinion in favor of capital punishment would prevent or substantially impair her ability to consider the full range of punishment...."

Chenoweth initially stated a strong preference for the death penalty. She believed that it is a burden for taxpayers to feed and clothe a person sentenced to life imprisonment. She elaborated, however, "I do believe the punishment should fit the crime. Whether it be a capital murder or the death penalty or life, I would have to weigh that very, very carefully. Without a reasonable doubt in my mind."

Appellant's counsel asked: "Could you, after the guilt phase, could you consider the mitigating circumstances, things about David, possibly, that could change your mind from imposing the death penalty?" Chenoweth responded, "After I listen to the law that the judge issued, it would be a decision then." Appellant's counsel inquired further, "But you could follow his instructions by considering both the death penalty and life imprisonment?" Chenoweth stated, "Yes, it would be very difficult. Yes, I suppose so."

Later, the following exchange took place between the prosecutor and Chenoweth.

MR. ROGERS: That's what I think he's getting to. Can you consider life in those—in some circumstances? And obviously if I didn't prove he merited death, you would then consider life?

VENIREMAN CHENOWETH: Yes, as an alternative.

MR. ROGERS: Even though you're not particularly happy with that punishment?

VENIREMAN CHENOWETH: No.

MR. ROGERS: It is something that under the law you could consider. Is that fair?

VENIREMAN CHENOWETH: That's fair.

MR. ROGERS: Is it accurate?

VENIREMAN CHENOWETH: It's accurate, yes, sir. You spoke it better than I could.

In order to clarify its understanding of her position, the trial court inquired: "Now, again, I have to ask Ms. Chenoweth ... would you ... based on that, consider both types of punishment if you were selected as a juror and if you got to that point in the proceedings?" Chenoweth responded, "Yes, sir. If we did."

Appellant argues that the court's question left Chenoweth in the position of judging her own qualifications for service on the jury. We disagree. The judge did not ask Chenoweth whether she would be a fair and impartial juror. Such a question, the answer to which is the essence of juror qualification, would certainly have allowed Chenoweth to judge her own qualifications; but the trial court did not so inquire. Instead, in order to determine Chenoweth's position on the punishment issue, the trial court sought an unequivocal answer. We do not fault the trial judge for believing Chenoweth's final, unequivocal answer.

*Voir dire* is both an educational and a discovery process. A determination of the existence and depth of bias and prejudice can be made accurately only after a potential juror understands the legal requirements of her responsibility as a juror. We do not expect veniremen to come to court with a legally sufficient or unerringly correct understanding of the requirements the law imposes on jurors. Often this educational process combines with a person's serious respect for the duties she is about to undertake to yield a new understanding of, and a firm commitment to follow, the law irrespective of preconceived notions or personal policy preferences. The trial judge is in the best position to determine whether that commitment is genuine or not, given his superior ability to assess the totality of a person's responses.

The standard of review under these circumstances is abuse of discretion. We find none on this record. The point is denied.

### III.

Appellant urges that the massive publicity preceding the trial in this case demanded a change of venue and, absent that, individual and sequestered *voir dire.*

### A.

■ Rule 32.04(b) requires that motions for change of venue in felony cases be filed within thirty (30) days of arraignment. Appellant did not file his motion for change of venue until nearly two years after the arraignment and less than three weeks prior to trial. We thus review the trial court's denial of appellant's motion for plain error and will reverse only for manifest injustice. Rule 30.20.

The eighty-one prospective jurors comprised the venire panel in this case. More than a third of the panel had either not heard of the crime or recalled hearing nothing about it in the more than six and one-half years between the murder and the trial. Several members of the venire remembered little or no detail of what they had heard or read. The trial judge struck 16 veniremen for cause because of pretrial publicity.

■ Of course, the relevant question is not whether there was publicity surrounding the crime, nor whether the prospective jurors in a case remembered the publicity or the crime; the critical question is "whether the jurors ... had such fixed opinions that they could not judge impartially the guilt of the defendant." *Patton v. Yount,* 467 U.S. at 1035, 104 S.Ct. at 2891, *citing Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). Whether to grant or deny a change of venue under these circumstances is a matter left with the trial court's sound discretion. *State v. Boggs,* 634 S.W.2d 447, 457 (Mo. banc 1982). An abuse of discretion exists only when the record shows that "the minds of the inhabitants of the county are so prejudiced against the defendant that a fair trial cannot be had there."

*State v. Carr,* 687 S.W.2d 606, 612 (Mo. App.1985).

Our review of the exposure of the venire to publicity does not indicate a level of prejudice resulting from publicity which rendered a fair trial impossible in this case. As the United States Supreme Court has said:

> That time soothes and erases is a perfectly natural phenomenon, familiar to all.... Not all members of the venire had put aside earlier prejudice, as the *voir dire* disclosed. They retained their fixed opinions, and were disqualified. But the testimony suggests that the *voir dire* resulted in selecting those who had forgotten or would need to be persuaded again.

*Patton,* 467 U.S. at 1034, 104 S.Ct. at 2890.

■ *Voir dire* achieved a similar end here. We therefore find no manifest injustice in the trial judge's refusal to grant a change of venue in this case.

### B.

Appellant also assigns error to the trial court's refusal to conduct individual and sequestered *voir dire.* Appellant urges that responses of veniremen holding opinions about appellant infected other veniremen with prejudice.

■ We have long recognized that "the examination of jurors as to their qualifications is conducted under the supervision of the trial court and the nature and extent of the questions counsel may ask are discretionary with that court." *State v. Smith,* 649 S.W.2d 417, 428 (Mo. banc 1983). Here, after initially examining twelve veniremen individually on matters of pretrial publicity, the trial court found the exercise counterproductive. Thereafter, the court divided the remaining panel into groups of 20 or 24 for the conduct *voir dire.* "This procedure was within the trial court's discretion". *State v. Guinan,* 665 S.W.2d 325, 329 (Mo. banc 1984), *cert. denied,* 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984). The record exhibits no evidence that this procedure produced any prejudice.

We find no abuse of discretion. The point is denied.

## IV.

Appellant next finds error in the state eliciting on redirect examination the names of victims of other crimes in which the state's witnesses, John Ramo and Ronald Broderick, were involved. Appellant argues that such questions and answers "created an inference of appellant's involvement in other crimes."

Ramo and Broderick plead guilty to second-degree murder in exchange for their testimony against appellant. Together with their families, they were placed in the Federal Witness Protection Program. On cross-examination, appellant's counsel inquired of Ramo whether he considered other assaults and murders on which he "had possible exposure.... [w]hen you made your deal, you were thinking about your potential liability in cases, correct?" The obvious implication of this questioning was that Ramo's favorable testimony was not trustworthy because it was given in return for the state's leniency on several additional murders and/or assaults which he committed.

In response, the prosecutor inquired of Ramo on redirect examination:

Q (By Mr. Rogers) Now, Mr. Ramo, I don't want you to talk about who was involved in these events, but you've been given a benefit by not facing the death penalty; is that correct?

A Yes.

Q And in return you've had to provide information about people that were involved in other incidents, correct?

A Yes.

Q One of those incidents was the bombing that led to burning to death in a car of George Faheen; is that correct?

A Yes.

Q One of those incidents was the bombing death of John Paul Spica, correct?

A Yes.

Q One of those events was the shotgun assault of John Charles Michaels, correct?

A Yes.

Q And the shotgun assault of Dennis Day that occurred at the same time?

A Yes.

Q One of those events was the shooting and execution of Michael Kornhardt; is that correct?

A Yes.

Q And you have testified about that in the past, have you not?

A Yes. (Tr. IV 283–284).

■ In *State v. Crawford,* 619 S.W.2d 735, 740 (Mo.1981), this Court said:

On redirect examination it is proper to examine a witness on any matters which tend to refute, weaken or remove inferences, impressions, implications or suggestions which may have resulted from his testimony on cross-examination, notwithstanding the facts elicited may be prejudicial to the defendant.

Beyond the fact that members of the jury were aware that Ramo and appellant had been involved in the murder of James Michaels, Sr., there was no indication whatever in the guilt phase that defendant participated in any of the other murders or assaults to which appellant's counsel alluded. Absent such evidence, the rule excluding proof of other crimes is not applicable. *State v. Pilchak,* 655 S.W.2d 646, 649 (Mo. App.1983).

We turn to Broderick's cross-examination. Broderick testified that he, too, faced other state charges and that he had been treated with leniency in return for his testimony. Broderick said that his family was enrolled in the Federal Witness Protection Program and at a cost to the taxpayers exceeding $241,000. Again, the prosecutor inquired on redirect into the specific crimes in which Broderick would testify as part of his plea bargain. And again, the prosecutor's questioning was appropriate bolstering. The point is denied.

## V.

Appellant next asserts that the trial court erred in overruling his objections to

the state's cross-examination of appellant's witnesses, psychologists Cuneo and Armour. Appellant argues that the prosecutor's questioning was persistent, prejudicial and argumentative and was an attempt to discredit these witnesses. Appellant argues that the prosecution's cross-examination "had two pernicious effects: (1) to discredit the witnesses by dint of nothing more substantial than sarcastic and vitriolic rhetoric, and (2) to implant in the jury's minds, without a show of evidentiary support, the idea that appellant had an antisocial personalty."

Appellant's arguments focus on two different aspects: (a) conduct during cross-examination and (b) conduct during closing arguments.

### A.

■■■■■ A trial court is vested with broad discretion in its control of cross-examination as a result of the trial court's superior ability to assess the tenor of cross-examination through firsthand exposure to the witnesses and the manner and form of questioning. *Myers v. City of Palmyra,* 431 S.W.2d 671, 679 (Mo.App.1968); *State v. Lue,* 598 S.W.2d 133 (Mo.1980); *State v. Johnson,* 486 S.W.2d 491, 496 (Mo.1972). Great latitude is allowed in the cross-examination of a witness with respect to credibility. *State v. Murrell,* 169 S.W.2d 409, 411 (Mo.1943).

There is little question on this record but that the prosecutor's cross-examination was pointed, rigorous, and finely detailed. Much of the antagonism between Cuneo and the prosecutor which the record portrays is a product of Dr. Cuneo's unwillingness to answer questions without evasion. We have reviewed the transcript with care and find no abuse in the trial court's control of cross-examination of Dr. Cuneo.

With regard to Dr. Armour, the record portrays a cross-examination which was again vigorous and often intense. We find no abuse of discretion, however, in the trial court's control of cross-examination.

### B.

■■■ Appellant alleges that the prosecutor's statements during closing argument in the guilt phase were meant to implant in the jury's mind the notion that appellant had an antisocial personality and that such a conclusion was without "a shred of evidentiary support". Both appellant and the state may draw any reasonable inference from the evidence which each believes in good faith to be justified. *State v. Newlon,* 627 S.W.2d 606, 617 (Mo. banc 1982). Contrary to appellant's assertion, the record contains sufficient evidence, including statements from the psychologists, to support the inferences made by the prosecutor.

### VI.

Appellant argues that the trial court erred in admitting photographs of the murdered George Faheen as evidence of aggravation in the penalty phase of the trial.

During the penalty phase of the trial, appellant stipulated to his conviction in the federal system under the Racketeer Influenced and Corrupt Organizations Act (RICO). The jury received this information in the form of a certified copy of the judgment and commitment report of the RICO conviction and a certified copy of appellant's indictment upon which the RICO conviction was based. Count I of that indictment alleged that appellant committed six criminal acts, including (1) the murder of James Michaels, Sr., (2) the conspiracy to murder James Anthony Michaels, III, Milton Schepp, and others, (3) the attempted murder of John Charles Michaels, (4) the murder of George Faheen, (5) the murder of Michael Kornhardt, and (6) the intimidation of Steve Wougamon with the intent to obstruct justice. The trial court informed the jury that the federal jury need only have found appellant guilty of two of the six acts alleged in the RICO indictment to convict. The judgment in the case did not specify the two acts on which the federal jury founded its guilty verdict.

■■■ We find no error in the trial court's admission of documents reflecting the RICO indictment and conviction. This is,

of course, consistent with the principle, long accepted, that in the penalty phase, the jury is entitled to receive as much information as possible in order to make an informed decision as to punishment. *Gregg v. Georgia,* 428 U.S. 153, 204, 96 S.Ct. 2909, 2939, 49 L.Ed.2d 859 (1976), *Lockett v. Ohio,* 438 U.S. 586, 602–3, 98 S.Ct. 2954, 2963–64, 57 L.Ed.2d 973 (1978), *State v. Gilmore,* 661 S.W.2d 519, 524 (Mo. banc 1983).

After the publication of the RICO information to the jury, the court admitted photographs of the body of George Faheen, who had been killed in a car bombing. The court admonished the jury that appellant had not been convicted of these murders; on cross-examination, the state's police witness testified that appellant had not had "a chance to prove his innocence for the murder of George Faheen".

The State argues that *State v. Blair,* 638 S.W.2d 739 (Mo. banc 1982), *State v. Gilmore,* 661 S.W.2d 519 (Mo. banc 1983), and *State v. Malone,* 694 S.W.2d 723 (Mo. banc 1985), permit the introduction of such evidence in the penalty phase. The cases are not on point. In *Gilmore,* this Court found that a defendant's videotaped confession to a crime committed in a manner similar to the one for which he was charged was admissible in the punishment phase of a capital murder case when the jury did not receive information concerning a conviction. In *Blair,* the court held defendant's confession following an arrest for an unrelated murder was both material and relevant as it revealed the defendant's motive in being asked to kill the victim for whose death he stood trial. In *Malone,* this court found no error in the introduction of evidence relating to graphic details of prior violent crimes upon which a defendant was convicted.

 As noted, the trial court has broad discretion in ruling evidence offered during the penalty stage of a capital case. While we agree the subject photographs are gruesome, the fact remains they were relative to the circumstances surrounding the death of George Faheen and connected and tied to one of the six criminal acts

charged in the federal indictment. The trial judge specifically pointed out to the jury that the defendant had not been convicted of the various other murders alleged in that indictment. Under the graphic and gruesome evidence received during the guilt phase of the trial, we find no error which calls for reversing the penalty assessed by the jury.

Even if we assume error for the sake of argument, that error is nonprejudicial. The jury listed the RICO conviction as a nonstatutory aggravating circumstance. It also found three statutory aggravating circumstances, any of which was alone sufficient to justify the death penalty. *State v. Malone,* 694 S.W.2d 723, 728 (Mo. banc 1985); *State v. LaRette,* 648 S.W.2d 96, 102 (Mo. banc 1983); *State v. Mercer,* 618 S.W.2d 1, 10 (Mo. banc 1981).

The facts before the jury were clear and essentially uncontroverted. Appellant participated in the selection of the victim as a target for murder. He stole a car identical to the victim's to enable him to plant the bomb quickly. He stalked the victim to learn of his habitual movements. He attached the bomb to the victim's car. He participated in efforts to remove evidence of the crime from the van. The murder was the product of appellant's desire to achieve economic benefit from the victim's death. The murder itself was horrible and vile.

From these uncontroverted facts, including photographs of the carnage on I–55, the jury sentenced appellant to die. Given the grisly evidence already before the jury, the challenged photographs were simply cumulative of the photographs of the victim's body in this case. We find no prejudice. The point is denied.

### VII.

Appellant next contends that the trial court erred in overruling his objection to the rebuttal testimony of St. Louis jail superintendent L.T. Brown during the punishment phase of the trial. A jail guard named Gleiforst testified for appellant that Leisure was an "ideal prisoner". On cross-examination, Gleiforst denied that he had

been suspended two days for allowing a visitor to see appellant without authorization or proper identification. The State called Brown, Gleiforst's supervisor, to testify that Gleiforst had been suspended for two days for allowing appellant the favor of this unauthorized visitor.

▬▬▬ The scope of rebuttal testimony is under the control of trial court and will be reversed only for abuse of discretion. *State v. Crain*, 638 S.W.2d 761, 762–763 (Mo.App.1982). Here, the facts show no abuse of discretion. Gleiforst had testified that appellant had been an "ideal prisoner". Gleiforst denied that he had received sanctions for granting appellant the favor of an unauthorized prisoner. Both Gleiforst's truthfulness and potential bias favoring appellant were pertinent on rebuttal. Brown's testimony was clearly relevant to those issues. The point is denied.

### VIII.

Appellant next claims the trial court erred in the penalty phase in refusing to submit appellant's Instruction No. 1 to the jury. The proposed instruction would have enumerated nonstatutory mitigating circumstances relating to appellant's character and background.

The proffered and refused Instruction No. 1 read as follows:

### INSTRUCTION NO. 1

If you decide that a sufficient aggravating circumstance or circumstances exist to warrant the imposition of death, as submitted in Instruction No. ＿＿, it will then become your duty to determine whether a sufficient mitigating circumstance or circumstances exist which outweigh such aggravating circumstance or circumstances so found to exist. In deciding that question you may consider all of the evidence relating to the murder of James Anthony Michaels, Sr.

You may also consider:

1. Whether the defendant acted under the substantial domination of another person or persons.

2. Whether the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law as substantially impaired.

3. The age of the defendant at the time of the offense.

You may also consider that the defendant had a mental disease or defect at the time of the murder of James Anthony Michaels, Sr.

You may also consider any circumstances which you find from the evidence in extenuation or mitigation of punishment:

1. That Fred Prater received total immunity from prosecution by both the State and Federal Governments.

2. That Federal and State criminal charges against John Ramo have been dropped and reduced and his sentences have been guaranteed to run concurrently.

3. That Federal and State criminal charges against Ronald Joseph Broderick have been dropped and reduced and his sentences have been guaranteed to run concurrently.

4. That you may now consider any "lingering doubts" you may have concerning defendant's guilt. Lingering doubt is defined as that state of mind between "beyond a reasonable doubt" and "beyond all possible doubt."

5. That James Anthony Michaels, Sr. was the leader of the Syrian faction of organized crime in St. Louis.

6. That the defendant had a minimal amount of formal education.

7. That the defendant lacked normal intellectual capabilities.

8. That defendant had been raised by several relatives throughout life.

9. That the defendant is a member of a family that will deeply mourn his loss.

10. That the defendant has demonstrated the capacity and ability to be a contributing member of prison society.

11. That if sentenced to life imprisonment without the possibility of probation or parole for 50 years, the defendant will

be 86 years old when he is first eligible for parole.

If you unanimously decide that a sufficient mitigating circumstance or circumstances exist which outweigh the aggravating circumstance or circumstances found by you to exist, then you must return a verdict fixing defendant's punishment at imprisonment for life by the Division of Corrections without eligibility for probation or parole until he has served a minimum of fifty years of his sentence. (L.F. 121–3)

The trial court refused appellant's Instruction No. 1 and gave the following instruction on mitigating circumstances.

### INSTRUCTION NO. 19

If you decide that a sufficient aggravating circumstance or circumstances exist to warrant the imposition of death, as submitted in Instruction No. 18, it will then become your duty to determine whether a sufficient mitigating circumstance or circumstance exist which outweigh such aggravating circumstances (sic) or circumstances so found to exist. In deciding that question you may consider all of the evidence relating to the murder of James Anthony Michaels, Sr.

You may also consider:

1. Whether the defendant acted under extreme duress or substantial domination of another person.

2. Whether the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law as substantially impaired.

3. The age of the defendant at the time of the offense.

You may also consider that the defendant had a mental disease or defect at the time of the murder of James Anthony Michaels, Sr.

You may also consider any circumstances which you find from the evidence in extenuation or mitigation punishment.

If you unanimously decide that a sufficient mitigating circumstance or circumstances exist which outweigh the aggravating circumstance or circumstances found by you to exist, then you must return a verdict fixing defendant's punishment as imprisonment for life by the Division of Corrections without eligibility for probation or parole until he has served a minimum of fifty years of his sentence. (L.F. 108)

In *State v. Young*, 701 S.W.2d 429 (Mo. banc 1985), appellant offered a substantially similar instruction for use in the punishment phase. This Court determined that Note on Use 5 of MAI–CR2d 15.44 decided the issue and that the trial court did not err in refusing the proffered instruction. Note on Use 5 reads:

> The jury may consider extenuating or mitigating circumstances even though not set out as "statutory" mitigating circumstances in Section 565.012.3 and even though not "authorized by law" within the meaning of that phrase discussed in 4 above. However, *no instruction should be given calling the jury's attention to any particular circumstance referred to in general in this paragraph.*

[Emphasis added.] In *Young*, this Court held that the language in the instruction offered by appellant referred to particular circumstances within the meaning of Note on Use 5, "which the jury could have considered, but upon which the jury should not have been instructed." 701 S.W.2d at 437.

The instruction proposed by appellant in this case likewise contained the particular circumstances forbidden in Note on Use 5. *Young* decides the issue against appellant. The trial court did not err in rejecting appellant's proffered Instruction No. 1.

### IX.

Finally, appellant argues that the death penalty, under these facts, is excessive and disproportionate to the sanction imposed in similar cases and that this Court should set aside his sentence in the exercise of its independent review. Section 565.035.3(3), RSMo 1986. Appellant focuses his disproportionality argument on the hypothesis that he is mildly mentally retarded, poorly educated, a substance abuser, and a follow-

er not dangerous in himself, but under the domination of others.

This murder sends shock waves through the soul of civilized society. It is so foreign to the acceptable manner of conducting "business" as to be nearly beyond comprehension. Civilized society need neither condone nor forgive crimes which make such a horrible mockery of our relationships, of our laws, and of our system of justice.

The jury found that this murder involved "torture or depravity of mind" and that the murder was "outrageously or wantonly vile or horrible or inhuman." Section 565.032.-2(7). Murders involving similar levels of depravity have consistently resulted in the death penalty. *State v. Guinan*, 665 S.W.2d 325 (Mo. banc 1984); *cert. denied*, 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984); *State v. Smith*, 649 S.W.2d 417 (Mo. banc 1983), *cert. denied*, 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983); *State v. LaRette*, 648 S.W.2d 96 (Mo. banc 1983); *State v. Blair*, 638 S.W.2d 739 (Mo. banc 1982), *cert. denied*, 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed.2d 1030 (1983); *State v. Newlon*, 627 S.W.2d 606 (Mo. banc 1982), *cert. denied*, 459 U.S. 884, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982).

Here, appellant and others coolly and deliberately discussed potential victims, how the death of each would enhance the Leisure family's influence, and calmly voted which to kill. The murder was carefully planned, prepared, the victim stalked, and the plan implemented with neither remorse nor regret. Appellant was an integral part of the entire sordid episode, personally surveilling the victim and planting the bomb. Contrary to appellant's suggestion and only because cooler heads prevailed, was the bomb not exploded in the church parking lot, claiming another victim.

The victim's body was blasted apart. Pieces of his flesh were scattered all over an interstate highway. Pieces of his body rained down on other motorists. A careful attempt to hide and destroy evidence followed.

■ Appellant's actions were conscienceless and pitiless; they were the product of a depraved mind, a mind which knew right from wrong but which chose to kill to further the economic ends of his family. The death penalty was neither disproportionate nor excessive.

Appellant knowingly created a risk of death to more than one person by means of a device which would normally be hazardous to the lives of more than one person. Section 565.032.2(3). The detonation of an explosive device, designed and placed to kill a driver, on an interstate highway is unquestionably hazardous to the lives of more than one person and displays a complete indifference to the lives of others. This Court upheld the death penalty in *State v. Griffin*, 662 S.W.2d 854 (Mo. banc 1983), *cert. denied*, 469 U.S. 873, 105 S.Ct. 224, 83 L.Ed.2d 153 (1984), in which the defendant sprayed bullets from a semiautomatic weapon at his victim in the presence of bystanders. This case is similar to *Griffin*. Appellant willingly placed innocent persons at risk. He carried out his murderous plot with a single-minded purpose, which saw only, and cared only, for the death of his intended victim, without regard for others who, too, faced peril from his plan.

■ Appellant claims that his lack of education and generally low intelligence render the death penalty in this case disproportionate and excessive. We do not agree. Death sentences of persons of appellant's intelligence level (75 I.Q.) have been consistently upheld. *State v. Shaw*, 636 S.W.2d 667, 672–673 (Mo. banc 1982) (I.Q. 73); *State v. Gilmore*, 681 S.W.2d 934, 940 (Mo. banc 1984) (70–85 I.Q.). That such a penalty is appropriate in this case is borne out by psychological testimony that appellant understood the difference between right and wrong.

■ Appellant's characterization of himself as a follower, not dangerous in himself but under the domination of others is not supported by the facts. We repeat: Appellant participated in the selection of the victim. He helped form and refine the plan by which the murder was carried out. Appellant practiced over and over to acquire and perfect swift techniques for in-

stalling a car bomb. He practiced on a car which he had stolen because its make matched that of the victim's car. He was under no duress or threat to participate; he made suggestions as to how to proceed as events unfolded. He suggested detonation of the bomb to bring about two deaths in the church parking lot. Later, he independently arranged for the concealment of the van used in the crime. David Leisure was hardly a follower. This case is thus distinguishable from prior cases in which a lesser penalty was imposed because the defendant was a "weakling and a follower". *State v. McIlvoy*, 629 S.W.2d 333, 342 (Mo. banc 1982).

■ Appellant claims that because other participants in the murder did not receive the death penalty, its imposition here is disproportionate and excessive. The sentences received by appellant's cousin are not determinative of the proportionality issue. This Court has recognized that:

> Any capital sentencing scheme may occasionally produce an aberrational outcome.... The issue when determining the proportionality of a death sentence is not whether any similar case can be found in which the jury imposed a life sentence, but rather whether the death sentence is excessive or disproportionate in light of similar cases as a whole (citations omitted).

*State v. Mallett*, 732 S.W.2d 527, 542 (Mo. banc 1987).

After a review of other cases, the defendant and the facts of this case, we hold that the death penalty was proper and was, therefore, neither excessive nor disproportionate.

### X.

The judgment of the trial court is affirmed.

BILLINGS, C.J., and DONNELLY, RENDLEN and HIGGINS, JJ., concur.

1. 18 U.S.C. § 1962. The act punishes, among other things, the conduct of an "enterprise" through a "pattern of racketeering activity." A pattern is established by showing two criminal offenses within the period of a ten-year statute of limitations.

BLACKMAR, J., concurs in part and dissents in part in separate opinion filed.

WELLIVER, J., concurs in part and dissents in part and concurs in separate concurring in part and dissenting in part opinion of BLACKMAR, J.

BLACKMAR, Judge, concurring in part and dissenting in part.

This is the most aggravated capital murder case that has come before our Court for review. I can add nothing to Judge Robertson's eloquent description of the atrocity of the offense. One might wonder, then, why there should not be a quick affirmance of the conviction and sentence. Because of what I consider a manifest error at the penalty phase, however, I cannot vote to sustain the death sentence.

### I.

The prosecution properly introduced into evidence the defendant's conviction under the federal RICO act.[1] *State v. Schlup*, 724 S.W.2d 236 (Mo. banc 1987), makes it clear that the defendant's criminal history may be brought out in the penalty phase of a case in which the death sentence is sought. The jury is entitled to full information about the defendant's past, comparable to what is available to a sentencing judge in a presentence report, in order to assist it in determining the sentence. The defendant has no objection simply because the details may be shocking or gruesome.

Here, however, the prosecutor was not content simply to introduce evidence of the prior conviction. He offered, at the penalty phase, two photographs, one of the bombing death of one George Faheen, and one of the scene of the bombing. The jury was not obliged to make any finding with regard to this bombing, and so the pictures did not aid it in any way in reaching its decision. The only purpose of the offer was to prejudice and inflame. By estab-

lished precedent, this is not a proper purpose.

There is constitutional error in receiving evidence in a death case which serves solely to inflame or arouse the passions. *Booth v. Maryland*, — U.S. —, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). There Maryland law provided for the admission in a death trial of a "victim impact statement," designed to inform the jury about the trauma suffered by the survivors of the victim of a homicide. The court held that this statement served no purpose of assisting the jury in resolving the issues before it, and simply operated to arouse the passions.

But I do not suggest that we operate only under federal coercion. Our law on the admission of photographic evidence of crimes of violence is well developed. We consistently hold that a trial judge, in the exercise of discretion, may admit photographs, however gruesome, if they serve a proper purpose in assisting the jury to decide issues pending before it. Where the jury is obliged to make findings as to such matters as willfulness or deliberation the graphic portrayal may be quite helpful. In the present case, the picture of the victim's severed torso could be helpful, at least in determining whether the method of killing posed a risk of death to more than one person. § 565.032.2(3). The defendant may not object to proper evidence simply because it is gruesome.

But established law also holds that photographs of the aftereffects of violent crimes are not properly received in evidence when they do not assist the jury in deciding matters submitted to it. In *State v. Floyd*, 360 S.W.2d 630 (Mo.1962), the prosecutor offered pictures of the victim's decomposed body, even though he made no claim that these were relevant to the issues of the case. This Court reversed holding that the defendant's objection should have been sustained because the pictures served simply to arouse the jury. We should reflect upon the words of the astute and respected Judge Paul W. Barrett, as follows:

The photograph objected to here, exhibit one, was neither needed nor offered for any of the conventional reasons or purposes,—to identify the victim, to show the nature and location of the injury, to illustrate or prove the character of the weapon, the surrounding circumstances, to determine the degree of the crime, or to show the cause of death. As a matter of fact, by the state's admissions, the body was in such a state of decomposition that most of these matters could not be found or illustrated, particularly by this photograph. In short, as the court said of another photograph, in reversing a manslaughter conviction, this exhibit is "extremely obscene, offensive, vulgar, horrid, and repulsive" (*State v. Robinson*, (Mo.) 328 S.W.2d 667, 671), and any relevant probative value it may have is far outweighed by the fact that it is needlessly and manifestly inflammatory and therefore prejudicially erroneous....

He then quoted with approval the following extract from 73 A.L.R.2d 1.c. 802:

"such photographs should not be admitted where their sole purpose is to arouse the emotions of the jury and to prejudice the defendant, * * * the sound governing principle is that photographs which are calculated to arouse the sympathies or prejudices of the jury are properly excluded if they are entirely irrelevant or not substantially necessary to show material facts or conditions * * *."

The principal opinion labors to justify the admission, or to find a ground for affirmance, but the effort is not convincing. It is first suggested that the gruesome pictures properly introduced at the guilt phase somehow mitigate the effect of the introduction of pictures of another killing which is not on trial. It is suggested that a little more gore would make no difference. I cannot accept this argument when a man is on trial for his life.

Nor is the effect of the pictures minified because the trial judge told the jury, correctly, that the defendant had not been convicted of the murder of Faheen. The submission of the pictures, then, serves to say to the jury, "these illustrate the after-

math of a bomb killing which the defendant may have participated in." How could it more clearly appear that the prosecution had no purpose in mind other than shock value in introducing the pictures into evidence? RICO is directed at habitual criminals who try to infiltrate legitimate businesses such as Labor unions. It does not require precise delineation of the particular offenses the defendants are found guilty of. The conviction is properly received in evidence but the inflammatory pictures, under the circumstances, permit inappropriate innuendo.

Weakest of all is the attempt to minimize the importance of the pictures because the jury found sufficient aggravating circumstances to authorize the death sentence. The vice of the pictures is in their tendency to inflame and to arouse the passions. This vice cannot be erased, however many statutory aggravating circumstances the jury finds.

There was simply no justification for the trial judge's admitting these pictures, over timely objection. The prosecutor should not have offered them and the trial judge should not have supinely accepted the offer. They should have been excluded under the holding of State v. Floyd, supra. There was no room for the exercise of discretion.

I am concerned because the principal opinion seems to give the trial judge an absolute quittance on his ruling. At the very least something should be said so that similar inappropriate rulings will not be made in the future. Now, on pictures, we are at the same place that State v. Newlon, 627 S.W.2d 606 (Mo. banc 1982), placed us with regard to oral argument. The word is out that "anything goes" at the penalty phase. Missouri justice should adhere to a higher standard. The penalty phase should not become a legalized lynching.

I am also concerned about the suggestion that the receipt of the pictures was not prejudicial. Reports on file with our statutory officer (§ 565.035.6) show that other juries, in their wisdom, did not authorize death sentences for the defendant's cousins Anthony and Paul Leisure, whose guilt was

identical to this defendant's. There is no way to determine just what caused the jury to opt for the ultimate sanction. Can it really be said, in a death case, that any substantial error, properly preserved, is not prejudicial?

II.

I am also troubled in an apparent lack of evenhandedness in the trial judge's rulings on challenges. He sustained the prosecution's challenge to a juror who indicated that all participants in a crime should receive the same sentence, while overruling the defendant's challenge to a juror who said that she was disturbed at the prospect of providing a murderer free room and board. Both rulings are probably within the court's discretion as defined in our cases, but I am concerned about appearances.

The judge also overruled a challenge to a juror who stated that she had formed an opinion and whose last words indicated doubt as to whether she could get that opinion completely out of her mind. Neither side probed as to the nature of her opinion, but reluctance to question in detail in the presence of the other jurors is understandable. If the trial judge is not willing to excuse the juror on the basis of her statement that she had formed an opinion expedients such as examination in chambers to determine whether her opinion is disqualifying should be considered. See State v. Jones, 749 S.W.2d 356 (Mo. banc 1988).

The finding of guilt is without error. Even the most depraved of criminals is entitled to a trial which is scrupulously fair when his life is at stake. Because of the admission of the pictures of the Faheen slaying, I would set aside the death sentence and remand the case for retrial of the penalty phase.